Johnny & Julie **CROCKER,** Appellants,

v.

**AMERICAN NATIONAL GENERAL INSURANCE COMPANY,** American National Property & Casualty Insurance Company, Gary Armstrong, and Armstrong & Armstrong Adjusters Association, Inc., Appellees.

No. 05–05–00943–CV.

Court of Appeals of Texas, Dallas.

Jan. 5, 2007.

David R. Gibson, Cedar Hill, for Appellants.

Gregory Lane Allen, Asbury & Asbury, L.L.P., Abilene, for Appellees.

Before Justices MORRIS, WHITTINGTON, and RICHTER.

## OPINION

Opinion by Justice WHITTINGTON.

Julie and Johnny Crocker appeal the trial court's summary judgment in favor of American National General Insurance Company (ANGIC), American National Property & Casualty Insurance Company (ANPAC), Gary Armstrong, and Armstrong & Armstrong Adjusters Association, Inc. (together referred to as Armstrong). Because the surface water exclusion in the Crockers' homeowners insurance policy barred their claims for damage to their home, we affirm the trial court's judgment.

### Background

In 1994, the Crockers contracted to have an aggregate rock surface installed on top of their existing patio. Several years later, the Crockers discovered that water collecting on the patio was running off into their home, causing water damage and mold. The Crockers submitted a claim under their homeowners insurance policy. The parties dispute whether the policy was issued by ANGIC or ANPAC. Armstrong, who was retained by one of the insurance companies to investigate the claim, inspected the Crockers' home. The Crockers' claim was denied in a letter dated March 19, 2001, which cited the exclusions in the policy for "wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself" (the inherent vice exclusion); loss caused by "rust, rot, mold, or other fungi;"

and "loss caused by or resulting from flood, surface water, waves, tidal water, or tidal waves, overflow of streams or other bodies of water or spray from any of these whether or not driven by wind" (the surface water exclusion).

The Crockers brought this action, and appellees filed motions for summary judgment. The trial judge granted the motions "on the sole ground that the insurance claim made the basis of Plaintiffs' causes of action against these defendants was properly denied pursuant to the surface water exclusion contained in the insurance policy at issue." The parties agree only ANGIC included the surface water exclusion as a ground for summary judgment in its motion. ANPAC and Armstrong contend the trial court's judgment in their favor may be affirmed nonetheless because summary judgment was proper on grounds that were presented in their motions.

### Standard of Review

We review a summary judgment de novo to determine whether a party has established its right to summary judgment as a matter of law. *Dallas Cent. Appraisal Dist. v. Cunningham,* 161 S.W.3d 293, 295 (Tex.App.-Dallas 2005, no pet.). A party moving for a traditional summary judgment must show no material fact issue exists and it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) (per curiam). When reviewing a summary judgment, we must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson,* 168 S.W.3d 802, 824–25 (Tex.2005).

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict to determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet). A no-evidence motion for summary judgment places the burden on the nonmovant to present summary judgment evidence raising a genuine fact issue. *See Espalin v. Children's Med. Ctr. of Dallas,* 27 S.W.3d 675, 683 (Tex.App.-Dallas 2000, no pet.).

The trial judge granted summary judgment for ANPAC and Armstrong on a ground not asserted in their motions. The supreme court has held we "should consider all summary judgment grounds the trial court rules on and the movant preserves for appellate review that are necessary for final disposition of the appeal when reviewing a summary judgment." *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996) (citing former appellate rule 90(a)). The court in *Cates* also held "the appellate court may, in the interest of judicial economy, consider other grounds that the movant preserved for review and that the trial court did not rule on." *Cates,* 927 S.W.2d at 624.

### ANGIC's Motion

ANGIC moved for summary judgment on four grounds. It asserted the exclusions for surface water damage, mold, and inherent vice precluded coverage; it fulfilled its duty of good faith and fair dealing to appellants; and there was no evidence to support appellants' common law and statutory bad faith claims.

■ The Crockers' homeowners policy provided, "We insure against all risks of physical loss to the property ... unless the loss is excluded in Section I Exclusions." Section I.i provides, "We do not

cover loss caused by or resulting from flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water or spray from any of these whether or not driven by wind." The term "surface water" is not defined in the policy. ANGIC bore the burden of proving the applicability of the exclusion. *See* TEX. INS. CODE ANN. art. 554.002 (Vernon 2006) (in suit to recover under insurance contract, insurer has burden of proof on any avoidance or affirmative defense such as language of exclusion in contract); *Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co.*, 107 S.W.3d 729, 733 (Tex.App.-Fort Worth 2003, pet. denied) (in general, insured bears initial burden of showing coverage and insurer bears burden of proving applicability of exclusion; burden then shifts back to insured to prove exception to exclusion).

As recently noted by the Texas Supreme Court, the rules for construing an insurance policy provision are well-settled:

If a policy provision has only one reasonable interpretation, it is unambiguous and we must construe it as a matter of law. If an exclusion has more than one reasonable interpretation, we must construe it in favor of the insured as long as that construction is not unreasonable. A policy provision is not ambiguous merely because different parties or different courts have interpreted it differently. As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did not. Moreover, in cases like this involving a standard form policy mandated by a state regulatory agency, we have held for more than 100 years that the actual intent of the parties is not what counts (as they did not write it), but the ordinary, everyday meaning of the words to the general public.

*Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006) (footnotes and citations omitted; emphasis in original).

Neither party alleges the surface water exclusion is ambiguous. The definition of "surface water" in the insurance context has been set forth in several Texas cases:

"Surface water" is defined as water or natural precipitation diffused *over the surface of the ground* until it either evaporates, is absorbed by the land, or reaches channels where water naturally flows. [Citations omitted] "Flood water" and "surface water," therefore, have a terranean nature,—*i.e.*, water overflowing its natural banks or which does not form a well-defined body of water— as opposed to water below the surface, whether from a natural or unnatural source.

*State Farm Lloyds v. Marchetti,* 962 S.W.2d 58, 61 (Tex.App.-Houston [1st Dist.] 1997, pet. denied) (emphasis added); *see also Transamerica Ins. Co. v. Raffkind,* 521 S.W.2d 935, 939 (Tex.Civ.App.-Amarillo 1975, no writ) ("[W]e hold that the term surface water is used in the policy to mean natural precipitation coming on and passing over the surface of the ground until it either evaporates, or is absorbed by the land, or reaches channels where water naturally flows"); *Sun Underwriters Ins. Co. of N.Y. v. Bunkley,* 233 S.W.2d 153, 155 (Tex.Civ.App.-Fort Worth 1950, writ ref'd) (surface water generally defined as derived from falling rain or melting snow and diffused over surface of ground, following no defined course or channel, not gathered into natural body of water, and lost by evaporation, percolation, or natural drainage).

The *Marchetti, Raffkind,* and *Bunkley* cases all define "surface water" as rain or natural precipitation diffused over "the surface of the ground." The issue here is whether the water on the Crockers' patio

was water on "the surface of the ground" for purposes of the policy. The Crockers contend the water was on the surface of the patio, not the surface of the ground. The Crockers further contend the surface of the patio was elevated at least one foot above the surface of the ground, and argue therefore no water on the patio's elevated surface "could ever constitute surface water as that term is defined in Texas law." While conceding there is no Texas case on point, ANGIC contends it would "be a strained interpretation of 'surface water' to hold that it does not include rainwater that falls upon concrete and asphalt structures such as patios, roads, driveways, playground blacktops and parking lots—structures which are by their nature placed upon the surface of the ground."

There is no Texas case involving the surface water exclusion in which water flowing from a raised patio caused damage. Further, there is no Texas case expressly holding that water flowing over a manmade surface instead of flowing over dirt is surface water. In two of the Texas cases discussing the surface water exclusion in insurance policies, however, water that flowed over man-made structures was determined to be surface water. In *Valley Forge Insurance Co. v. Hicks Thomas & Lilienstern*, 174 S.W.3d 254 (Tex.App.-Houston [1st Dist.] 2004, pet. denied), the downtown Houston area had been flooded by heavy rains caused by Tropical Storm Allison. The appellee was a law firm forced to conduct business from an alternate location after the basement of its building flooded and the electrical equipment supplying power to the building was damaged. *Valley Forge Ins. Co.*, 174 S.W.3d at 255. The law firm had purchased a premises insurance policy to provide coverage for lost income if the firm suffered losses from a covered peril. *Valley Forge Ins. Co.*, 174 S.W.3d at 255–56. The policy, however, contained a provision specifically excluding from coverage losses

due to flood or surface water. *Valley Forge Ins. Co.*, 174 S.W.3d at 256. Valley Forge denied the law firm's claim. The law firm sued, and the trial judge rendered summary judgment that the losses were covered. *Valley Forge Ins. Co.*, 174 S.W.3d at 256. The court of appeals reversed the trial court's judgment, holding the surface water exclusion applied to preclude coverage for the law firm's losses. *Valley Forge Ins. Co.*, 174 S.W.3d at 259.

The court described the flood based on fact stipulations by the parties:

> Buffalo Bayou overflowed its banks and flooded the entire downtown Houston area. Water rushed into the Albert Thomas Convention Center, broke through an interior basement wall of that building, flowed into a downtown parking garage, then into the pedestrian tunnel system, and finally poured into the Bank of America Building located at 700 Louisiana Street [where the appellee's business was located].

*Valley Forge Ins. Co.*, 174 S.W.3d at 255. The court held the policy's exclusion, "We will not pay for loss or damage caused directly or indirectly by ... [f]lood, surface water, waves, tidal waves, overflow of any body of water, or the spray, all whether driven by wind or not" was not ambiguous. *Valley Forge Ins. Co.*, 174 S.W.3d at 257, 258. The court framed the issue to be "whether the water had changed its nature so as no longer to be considered flood or surface water, as the law firm argues, thus affording coverage." *Valley Forge Ins. Co.*, 174 S.W.3d at 258. The court noted the definitions of flood and surface water under Texas law: "Surface water is generally defined as that which is derived from falling rain ... and is diffused over the surface of the ground.... Such waters are not divested of their character as surface waters by reason of their flowing from the land on which they first make their appearance onto lower land in obedience to

the law of gravity." *Valley Forge Ins. Co.*, 174 S.W.3d at 258 (quoting *Bunkley*, 233 S.W.2d at 155). Under this definition, the law firm's loss was excluded from coverage:

> Tropical Storm Allison deluged the area with rain, creating a large amount of surface water and causing Buffalo Bayou to overflow its banks. Once the water entered the convention center, it behaved as strong waters behave—it caved in an interior wall and rushed onward. It did not back up into a sewer line, cause a water main to burst, commingle with water from an underground swimming pool, or otherwise change or dilute its nature. It simply flowed onward, as flood and surface water is wont to do, obeying the law of gravity and flowing into man-made underground structures. The law firm's loss was caused by a combination of flood and surface water; accordingly, the loss was excluded under the terms of the policy.

*Valley Forge Ins. Co.*, 174 S.W.3d at 259.[1]

In *Bunkley*, during heavy rainfall, hundreds of chickens on Bunkley's property drowned when water ran into their chicken house. *Bunkley*, 233 S.W.2d at 153. Bunkley's insurance policy covered damage from flood. The court discussed the distinction between flood waters and surface waters, noting:

> Surface water is generally defined as that which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state.... Surface waters are those which have diffused themselves over the surface of the ground, following no defined course or channel, and which have not gathered into or formed a natural body of water, and are not lost by evaporation, percolation, and natural drainage.... Surface waters are those which are produced by rainfall, melting snow, or springs, and which in the case of the two first-mentioned sources are precipitated, and in the case of the last-mentioned source, rise upon the land.... Such waters are not divested of their character as surface wa-

1. The *Valley Forge* court distinguished two cases holding "that flood or surface water, by the time it causes property damage, is no longer flood or surface water." *Valley Forge Ins. Co.*, 174 S.W.3d at 258 (citing *Raffkind*, 521 S.W.2d at 936, and *Marchetti*, 962 S.W.2d at 61). In *Raffkind*, Dan Raffkind purchased a homeowners policy from Transamerica that excluded loss caused by surface water, but not loss caused by water below the surface of the ground. *Raffkind*, 521 S.W.2d at 936. Because the water causing the damage had seeped into underground ducts and was discharged as water vapor into the home, the court determined "[n]one of the damage was attributable to the water while it was upon or passing over the surface of the ground; all of the damage was caused by or resulted from the water after it had lost its status as surface water by being absorbed into the ground." *Raffkind*, 521 S.W.2d at 939. Raffkind's loss was covered by the policy. *Raffkind*, 521 S.W.2d at 939. The *Marchetti* case was also a dispute under a homeowners policy that excluded losses caused by surface water. The Marchettis sustained damage to their home and its contents as a result of the backup of water and raw sewage through a drain opening in their utility room. *Marchetti*, 962 S.W.2d at 59. The court held the loss was not caused by surface water. Even though surface water may have "initiated the chain of events which led to appellees' loss," the loss was actually caused by water and sewage that had "lost its status as surface water by flowing into underground sewage lines." *Marchetti*, 962 S.W.2d at 61. Here the dispute is somewhat different from those in *Valley Forge*, *Raffkind*, and *Marchetti*. The parties do not contend the water began as "surface water" and then did or did not "lose its status as surface water," *see Marchetti*, 962 S.W.2d at 61, but rather disagree whether the water was on the "surface of the ground" at all.

ters by reason of their flowing from the land on which they first make their appearance onto lower land in obedience to the law of gravity.

*Bunkley*, 233 S.W.2d at 155 (citations omitted).

Bunkley testified his land sloped gently downward toward and beyond the two chicken houses. At one end of the houses there was a slight depression, eight or ten feet across. *Bunkley*, 233 S.W.2d at 156. During the heavy rains, as the water reached the first house, some of it passed to the left of the houses and "poured over a low concrete foundation at the east end of the houses, thus causing the loss of the chickens." *Bunkley*, 233 S.W.2d at 156. The excessive rainfall caused the water to spread over the entire area of Bunkley's land, and the water was about four inches deep where it flowed over the low concrete foundations of the chicken houses. *Bunkley*, 233 S.W.2d at 156. The court concluded, "[u]nder all the authorities, the water which came into the chicken houses can be regarded only as surface water and not as a flood." *Bunkley*, 233 S.W.2d at 156.

While there are many cases from other jurisdictions discussing the definition of "surface water" as used in insurance policies, the parties did not identify another case involving a raised patio. Appellees cite *Smith v. Union Auto. Indemnity Co.*, 323 Ill.App.3d 741, 257 Ill.Dec. 81, 752 N.E.2d 1261, 1266 (2001), *appeal denied*, 197 Ill.2d 585, 261 Ill.Dec. 529, 763 N.E.2d 778 (2001), in which the court discussed whether water could be "surface water" when its flow had been altered by man-made structures. In *Smith*, during a torrential rainstorm, the window wells in the basement of the Smiths' home filled with water, causing the windows to break and the basement to fill with five feet of water. Water also came into the basement through the sewer drain. *Smith*, 257 Ill. Dec. 81, 752 N.E.2d at 1263. The Smiths' claim under their homeowners insurance was denied, and the trial judge granted summary judgment for the insurer, determining the damage to the Smiths' home was caused by surface water and was thus excluded from coverage. *Smith*, 257 Ill. Dec. 81, 752 N.E.2d at 1263. On appeal, the Smiths argued the term "surface water" referred to "water flowing naturally whose flow has not been altered in any way by man-made structures." *Smith*, 257 Ill.Dec. 81, 752 N.E.2d at 1266. The court reviewed cases from other jurisdictions and found the cases generally defined "surface water" as "water that (1) derives from natural precipitation such as rain or melting snow; (2) flows over or accumulates on the surface of the ground; and (3) does not form a definite body of water or follow a defined watercourse." *Smith*, 257 Ill.Dec. 81, 752 N.E.2d at 1267. The court continued:

> We note that none of these cases defines "surface water" as water whose flow has not been affected in any way by human construction. While some of the cases refer to "natural drainage," or water "flowing naturally," those terms are used to distinguish surface water from water in a defined watercourse or a lake or pond. There is no indication in the case law that "naturally" should be interpreted to mean completely untouched or unaffected by man-made structures. It seems to us that if we did adopt plaintiffs' proposed definition, it would be nearly impossible for surface water to exist, given the highly developed state of our society and the fact that few places without roads or other man-made structures exist today. This causes us to conclude that plaintiffs' proposed definition of "surface water" does not reflect the popular and ordinary meaning of the term. The average reasonable person would not limit surface water to water

whose flow has not been altered in any way by paved surfaces, buildings, or other structures.

*Smith,* 257 Ill.Dec. 81, 752 N.E.2d at 1267. Therefore, the court held the water entering the Smiths' home as a result of a torrential rainstorm was surface water excluded by their homeowners insurance policy. *Smith,* 257 Ill.Dec. 81, 752 N.E.2d at 1268. The *Smith* court did reject the insurance company's position that surface water "is simply rainwater that has fallen to the ground, without regard to whether its flow has been affected by man-made objects." *Smith,* 257 Ill.Dec. 81, 752 N.E.2d at 1266. The *Smith* court noted in some cases, water is not "surface water" because of man-made constructions. *See Smith,* 257 Ill.Dec. 81, 752 N.E.2d at 1267–68 (discussing *Heller v. Fire Ins. Exch.,* 800 P.2d 1006 (Colo.1990) (spring runoff of melting snow diverted from regular path onto the Hellers' property by three parallel trenches constructed behind property was not "surface water" because trenches were "defined channels," and surface water follows no defined course or channel); *Cochran v. Travelers Ins. Co.,* 606 So.2d 22 (La.Ct.App.1992) (rainwater that overflowed and seeped from roof into interior of building was not "surface water" because it was not water that collected and lay on the ground); and *Ebbing v. State Farm Fire & Cas. Co.,* 67 Ark.App. 381, 1 S.W.3d 459 (1999) (water from burst water main was not "surface water" because it did not accumulate from natural causes)). The *Smith* court found these cases distinguishable on their facts. *Smith,* 257 Ill. Dec. 81, 752 N.E.2d at 1268.

ANGIC also cites *Cameron v. USAA Property and Casualty Insurance Co.,* 733 A.2d 965 (D.C.1999). In that case, thirty inches of snow accumulated on the Camerons' uncovered outdoor patio after a series of severe winter storms. *Cameron,* 733 A.2d at 966. Subsequent rainstorms and rising temperatures caused the snow to melt. Two gutters on the Camerons' roof had been damaged in the storms. The damage to the gutters contributed to the accumulation of additional snow and rain on the patio, and water began to overflow. The patio was graded so that water would drain into the driveway, but the accumulation from the storms was so great that some of the water ran down a stairwell leading from the patio to the basement, past a blocked drain, and under the basement door. The Camerons' personal property in the basement was damaged. *Cameron,* 733 A.2d at 966. The insurance company denied the Camerons' claim under their all-risk homeowners policy based upon an exclusion for surface water. *Cameron,* 733 A.2d at 966.

The Camerons argued the melted snow and rain causing the damage was not "surface water" because it did not "lie or flow naturally on the earth's surface" as required in the definition of surface water adopted by the court. *Cameron,* 733 A.2d at 969. Rather, the water was first on the patio before it overflowed and entered the basement. Because the patio was a man-made structure, and not the earth's surface, the Camerons argued, the water on the patio was not "surface water." *Cameron,* 733 A.2d at 969. The court rejected this argument, as well as the Camerons' argument the water was not "surface water" because the patio was designed to channel water into the driveway. The Camerons argued this was a "defined course or channel" so that the water lost its character as surface water. The court disagreed, holding the water "flowed naturally" from the patio to the basement without following a defined course or channel, regardless of the fact the patio was intended to channel water into the driveway, because the water was never channeled or

diverted from its natural course. *Cameron*, 733 A.2d at 970.

◼ Here, the parties agree the resurfacing of the patio caused rainwater to drain into the house instead of into the flower beds as planned. The Crockers contend, however, that because the rain hit the patio instead of the dirt and the top of the patio was eight to ten inches or a foot from the soil, it was not water on the surface of the ground.[2] They argue if the raised patio is held to be the surface of the ground, there would be no limit to application of the exclusion; it could be extended to water on the roof of a home if interpreted as ANGIC proposes. *But see Aetna Fire Underwriters Ins. Co. v. Crawley*, 132 Ga.App. 181, 207 S.E.2d 666, 668 (1974) (majority of cases apply "surface water" term strictly to water on surface of ground and not to rainwater falling on and flowing from roof of insured dwelling). We disagree. As noted in *Smith*, an average reasonable person would not limit surface water to rain falling only on dirt and not on any paved surfaces or other structures. *See Smith*, 257 Ill.Dec. 81, 752 N.E.2d at 1266; *see also Fiess*, 202 S.W.3d at 746 (ordinary, everyday meaning of words to general public is what counts in interpreting policy form language). In both *Valley Forge* and *Bunkley*, surface water collected at least in part on man-made surfaces. The ordinary meaning of the words "surface water" in the Crockers' policy reasonably can include rainwater that has collected on the surface of their patio. We agree with the trial judge that the surface water exclusion applied to the Crockers' claims under their homeowners insurance policy.

ANGIC, by cross-point, argued the trial court erred in failing to grant summary judgment on the ground the inherent vice exclusion precluded coverage as a matter of law. We need not address this argument in light of our holding the claim is excluded from coverage under the surface water exclusion. *See* TEX.R.APP. P. 47.1.

◼ The Camerons asserted claims against ANGIC for breach of common law and statutory duties of good faith. ANGIC also moved for summary judgment on these claims. An insurer is liable for breach of the duty of good faith and fair dealing "if the insurer knew or should have known that it was reasonably clear that the claim was covered." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997). Here, the Camerons' claim was excluded from coverage under the policy. "As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex.1995). While the court in *Stoker* did not exclude "the possibility that in denying the claim, the insurer may commit some act, so extreme, that it would cause injury independent of the policy claim," *Stoker*, 903 S.W.2d at 341, the Camerons argue only that liability was reasonably clear under the policy. Summary judgment was proper for ANGIC on

---

**2.** Johnny Crocker testified:

> Q. How—what is the thickness from the surface of the ground to the top of the patio at the point around the—the flower bed there?
> A. From—are you talking about from the top of the dirt at the flower bed up?
> Q. Right.
> A. I would say probably eight or ten inches. . . . It may be a foot.

> . . .
> Q .... You mentioned that the—the slab is up six to eight inches above the ground?
> A. Probably more than that. It's probably 6 to 8 inches from the top of the flower bed where the flowers are. It's probably a foot or more from the ground.

these claims. We overrule appellants' issue as to ANGIC.

### ANPAC's Motion

ANPAC did not assert any grounds for summary judgment based on exclusions in the policy. ANPAC's motion for summary judgment alleged it was not a party to any contract with appellants. Because we have held the Crockers' loss was excluded from coverage under the policy, even if ANPAC was a party to the policy, summary judgment would have been proper for ANPAC on the Crockers' claims arising out of the policy.

ANPAC also moved for summary judgment on traditional and no-evidence grounds and argued in its appellate brief that no agent, representative, or employee of ANPAC committed an act so extreme it would cause injury to appellants independent of the policy claim. Appellants specially excepted to this ground, arguing "[t]hat assertion, for lack of a better word, is not an element of any of Plaintiffs' claims or any of ANPAC's affirmative defenses." All special exceptions were overruled in the trial court's summary judgment order. Appellants note in their brief they asserted the special exception, but do not make any argument or point to any evidence of an act injuring them independent of the policy claim. We conclude summary judgment was proper for ANPAC.

### Armstrong's Motion

Armstrong likewise did not assert any grounds for summary judgment based on exclusions in the Crockers' homeowners insurance. In its amended motion for summary judgment, Armstrong asserted there was no evidence to support the Crockers' claims and argued several of the Crockers' claims failed as a matter of law. The Crockers objected to Armstrong's summary judgment evidence but did not address the merits of Armstrong's amended motion. The trial judge overruled "all of Plaintiffs' objections and special exceptions" presented in the Crockers' summary judgment responses in the summary judgment order.

As noted above, we may consider summary judgment grounds "the movant preserved for review and that the trial court did not rule on." *Cates*, 927 S.W.2d at 624. On appeal, Armstrong presents cross-points and argues the trial judge erred in not granting summary judgment on each ground asserted in Armstrong's amended motion for summary judgment. Appellants argue only that summary judgment for Armstrong was improper because it was granted on an unasserted ground.

We agree with Armstrong the trial judge could have granted summary judgment on the grounds asserted in Armstrong's amended motion. Armstrong asserted it had no legal duty to the Crockers as a matter of law for actions it took on behalf of ANGIC; it was not negligent per se for violation of Texas Penal Code sections 22.02, 28.03, and 28.04 as a matter of law; and its conduct was not a producing cause of damage to the Crockers as a matter of law and was not a violation of Texas Insurance Code article 21.21 or the DTPA as a matter of law. Armstrong also asserted several "no evidence" points on breach of a duty of care, proximate cause, negligent misrepresentation, and DTPA and Insurance Code violations.

 An independent adjusting firm hired exclusively by an insurance carrier has no relationship with, and therefore no duty to, an insured. *Dear v. Scottsdale Ins. Co.*, 947 S.W.2d 908, 917 (Tex.App.-Dallas 1997, writ denied), *disapproved on other grounds by Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 122–23 (Tex.2001). In *Dear*, this Court said that, absent a con-

tractual relationship between the insured and the adjuster, the adjuster could not be liable to the insured for improper investigation and settlement advice, "regardless of whether [the insured] phrased his allegations as negligence, bad faith, breach of contract, tortious interference, or DTPA claims." *Dear,* 947 S.W.2d at 917; *see also Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 697–98 (Tex.1994) (duty of good faith emanates from special relationship between insured and insurer; without insurance contract there is no special relationship and no duty of good faith). Therefore, summary judgment was proper on the ground that Armstrong had no legal duty to the Crockers for actions it took on behalf of ANGIC.

Summary judgment was also proper on the Crockers' claims that Armstrong was negligent per se under certain sections of the Texas Penal Code. The Crockers cite no authority for the proposition that sections 22.04, 28.03, or 28.04 of the Texas Penal Code are appropriate standards for the imposition of civil damages. Appellants do not present argument on appeal regarding the analysis we would need to undertake to determine whether it is appropriate to impose tort liability for violations of these criminal statutes. *See, e.g., Perry v. S.N.,* 973 S.W.2d 301, 305, 309 (Tex.1998) (discussing factors to consider in determining whether application of negligence per se appropriate). In the absence of briefing on this issue, we decline to adopt a new standard for negligence per se and conclude summary judgment would have been proper on this ground.

In its second, third, fourth, and fifth cross issues, Armstrong argues summary judgment was proper on the remaining grounds it asserted in its amended motion. We agree. In their petition, the Crockers allege Armstrong's liability arises from its conclusion surface water caused the damage to the Crockers' home, its "outcome-oriented investigation," and its report to ANGIC that it should review the Crockers as a continuing risk due to mold and mildew it observed. Armstrong moved for summary judgment on traditional and no-evidence grounds on all of the Crockers' claims. In response, the Crockers did not meet their burden of producing more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See Gen. Mills Rests., Inc.,* 12 S.W.3d at 832–33. Their alleged injury and damage arises from the wrongful denial of their claim by ANGIC. They do not present argument or evidence to create a fact issue on a duty to them breached by Armstrong or a misrepresentation made by Armstrong that was a proximate or producing cause of this damage. Accordingly, we conclude summary judgment would have been proper for Armstrong on the grounds presented in its motion.

We affirm the trial court's judgment.