[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14061

_____

D.C. Docket No. 1:10-cv-21840-JLK


FLAMINGO SOUTH BEACH I CONDOMINIUM ASSOCIATION, INC.,

                                                      Plaintiff-Appellant,

versus

SELECTIVE INSURANCE COMPANY OF SOUTHEAST,
a North Carolina corporation,

                                                      Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 10, 2012)

Before MARCUS and BLACK, Circuit Judges, and EVANS,[*] District Judge.

EVANS, District Judge:

_____

[*]The Honorable Orinda Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

This case arises from a breach of contract claim brought by a property owner, Flamingo South Beach I Condominium Association, Inc. ("Flamingo") against a property insurer, Selective Insurance Company of Southeast ("Selective") for failure to pay under the terms of a flood insurance policy. The appeal follows the district court's grant of summary judgment to Selective.

On June 5, 2009, a severe rainstorm struck Miami Beach causing 9.88 inches of rain to fall within two hours. Flamingo's claim is that water entered the condominium lobby from an adjacent deck, causing significant damage. Flamingo makes three arguments: (1) the district court erred as a matter of law in finding that no coverage existed under the policy for damage caused by heavy rainfall which pooled on an elevated deck and ran into the condominium lobby; (2) the district court abused its discretion in striking an expert declaration based on untimely disclosure; and (3) the district court erred in determining that no genuine issue of material fact remained which precluded summary judgment in Selective's favor on an alternate theory of liability. After careful consideration of Flamingo's arguments, we conclude that the district court did not abuse its discretion in striking the expert report and that it properly granted summary judgment to Selective.

2

**BACKGROUND**

Flamingo owns a 562 unit high rise condominium building in Miami Beach, Florida. It purchased a standard flood insurance policy from Selective. The policy was issued pursuant to the provisions of the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 et seq., which authorized the Administrator of the Federal Emergency Management Agency ("FEMA") to create a national flood insurance program. 42 U.S.C. § 4011. The Act authorizes private insurers to offer a standard flood insurance policy ("SFIP"). While these policies are written by private firms, the federal government acts as the guarantor and reinsurer. SFIP claims are ultimately paid by the U.S. Treasury. Selective appears in this action in a fiduciary capacity as the fiscal agent of the United States. 44 C.F.R. § 62.23(f-g).

On August 5, 2011, the district court granted Selective's motion for summary judgment. The district court concluded that the policy did not provide coverage for Flamingo's claim that the accumulated water on the deck constituted " surface waters" (a requirement of the policy) because the water on the elevated deck "did not make any contact with the surface of the earth." Flamingo S. Beach I Condo. Ass'n v. Selective Ins. Co. of Se., No. 10-CV-21840-KING, at *7 (S.D. Fla. Aug. 5, 2011). It also rejected Flamingo's alternate theory that a deck drain backup caused by flood

3

surface waters caused the lobby damage. The district court concluded that Flamingo had not carried its evidentiary burden. Selective had proffered expert testimony that such a drain backup could not have occurred and did not occur. Flamingo's evidence only showed that lobby damage caused by water from the claimed drain backup was a "mechanical possibility." Prior to granting Selective's motion, the district court had struck the declaration of Rene Basulto, one of Flamingo's expert witnesses, because Basulto had not been timely disclosed as an expert witness.

## DISCUSSION

I.    The District Court's Determination That There Was No Policy Coverage for Heavy Rainfall Which Pooled on the Deck Surface and Entered the Lobby

The South Tower of Flamingo's condominium building, at issue here, has an elevated lobby with an adjacent 30,000 square foot promenade deck. The deck surface has an upper area and a contiguous sunken area (down two steps from the upper area). The slope of the deck is such that water drains toward the sunken level. The sunken level is adjacent to a lobby which incurred water damage during the storm. Flamingo contends that this damage was the result of "surface waters" as that phrase is used in the SFIP and is, therefore, a covered event under the policy and that the district court erred in concluding that it was not.

4

The policy at issue here, the SFIP, was established by regulation and is codified at 44 C.F.R. pt. 61, App. A(3).  The SFIP provides coverage for direct physical loss caused by flood.  The term "flood" is defined in the SFIP as:

1.    A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is your property) from . . .

  b.    Unusual and rapid accumulation or runoff of surface waters from any source

The term "surface waters" is not defined in the policy.

The policy excludes from coverage "[w]ater or water-borne material that . . . backs up through sewers or drains . . . unless there is a flood in the area and the flood is the proximate cause of the sewer or drain backup . . . ."  Policy, § V.(D)(5).

Policies under the National Flood Insurance Program are contracts and must be interpreted by first examining the natural and plain meaning of a policy's language. Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program, 129 F.3d 581, 585 (11th Cir. 1997).  The interpretation of SFIP contracts is a matter of federal law under standard insurance law principles rather than state law.  Newton v. Capital Assurance Co., 245 F.3d 1306, 1309 (11th Cir. 2001); Carneiro Da Cunha, 129 F.3d at 584; Hanover Bldg. Materials v. Guiffrida, 748 F.2d 1011, 1013 (5th Cir. 1984); Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 135 (1st Cir. 1984).  If the policy

5

language is unambiguous, it is applied directly. Studio Frames Ltd. v. Standard Fire Ins. Co., 483 F.3d 239, 245 (4th Cir. 2007). "[A]mbiguity does not exist simply because a contract requires interpretation or fails to define a term." Key v. Allstate Ins. Co., 90 F.3d 1546, 1549 (11th Cir. 1996) (citing Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993)); see Tackitt v. Prudential Ins. Co. of Am., 758 F.2d 1572, 1575 (11th Cir. 1985). Contract interpretation is a question of law which we review de novo. Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1065 (11th Cir. 2004).

There are no Eleventh Circuit opinions which define the phrase "surface waters" in an SFIP. Though authority from other circuits of the United States Court of Appeals, not binding on this Court, may be considered for its persuasive value, United States v. Diamond, 430 F.2d 688, 692 (5th Cir. 1970)[1], no other circuit court has addressed the meaning of the phrase "surface waters" in an SFIP.

The parties have cited two opinions from United States district courts which have addressed the meaning of the phrase "surface waters" in an SFIP. In Cross Queen, Inc. v. Director, FEMA, 516 F. Supp. 806, 807-08 (D.V.I. 1980), the District Court of the Virgin Islands held that the collection of water on upper balconies which

---

[1]In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981.

6

seeped into upper floor rooms could not be considered surface waters because it did not "emanate from the inundation of normally dry land areas." The court determined that the phrase has commonly been interpreted to mean rain which has diffused itself over the surface of the earth. Id. at 808. Selective argues that this case is on point. Flamingo argues that Cross Queen is inapposite because the definition of "flood" in the SFIP has been amended since it was issued.[2] A Louisiana district court has also addressed the meaning of "surface waters" in an SFIP. The district court in the Eastern District of Louisiana in Cali v. Republic Fire & Casualty Insurance Co., CIV. A. 08-5010, 2009 WL 5064469, at *4 (E.D. La. Dec. 16, 2009) interpreted "surface waters"in an SFIP to include rainwater pooling on the ground and seeping into a home through weep holes at the base of the home's brick facade. The water that damaged Flamingo's lobby did not pool on the ground as in Cali; it pooled on an elevated deck several feet above the ground. The facts of the Cali case were dissimilar to those here; that case does not illuminate whether water pooling on an elevated deck would be considered surface waters. Cross Queen, Inc. is on point and

---

[2]Cross Queen, Inc. was decided under a prior version of the SFIP which defined flood as: "A general and temporary condition of partial or complete inundation of normally dry land areas from . . . surface waters." 516 F. Supp. at 807. The definition of "flood" in SFIPs has since been expanded. Unlike the SFIP in Cross Queen, Inc., Flamingo's policy defined flood as either the "inundation of normally dry land areas" or "inundation. . . of two or more properties" from surface waters. Flamingo argues that this change in language broadened the definition of flood to include the accumulation of water on its elevated deck. We disagree. The change in the definition of "flood" did nothing to alter the definition of "surface waters" at issue here.

7

is persuasive.

Several courts have discussed the meaning of the phrase "surface water" in all-risk insurance policies. See Front Row Theatre, Inc. v. Am. Mfrs. Mut. Ins. Cos., 18 F.3d 1343, 1347-48 (6th Cir. 1994); Crocker v. Am. Nat'l Gen. Ins. Co., 211 S.W.3d 928, 931 (Tex. Ct. App. 2007); Cameron v. USAA Prop. & Cas. Ins. Co., 733 A.2d 965, 967 (D.C. 1999); Sherwood Real Estate & Inv. Co. v. Old Colony Ins. Co., 234 So.2d 445, 448 (La. Ct. App. 1970). Only a few of these cases are even close to being factually on point. These cases each interpret all-risk policies which, unlike the SFIP, exclude damage resulting from surface waters from coverage. See Front Row Theatre, Inc., 18 F.3d at 1345; Crocker, 211 S.W.3d at 930-31; Cameron, 733 A.2d at 966; Sherwood Real Estate & Inv. Co., 234 So.2d at 446. Further, the majority of these cases do not involve water pooled on a surface significantly elevated from the surface of the ground. Front Row Theatre, Inc., 18 F.3d at 1345 (discussing damage caused by water flowing from parking lot through theater door); Crocker, 211 S.W.3d at 936 (discussing water pooling on patio twelve inches off the ground); Cameron, 733 A.2d at 966 (discussing water from melting snow on a patio graded with the ground's surface). Because these cases do not involve SFIP policies, they are neither controlling nor persuasive and do not guide the Court's interpretation of the meaning of the phrase "surface waters."

8

We next consider Flamingo's argument that the phrase "surface waters" is ambiguous as to whether it includes rainwater which ran from the elevated deck into the lobby.  Flamingo argues that policy ambiguities should be construed in favor of coverage.

Although it is not defined in the policy, the term "surface waters" is not ambiguous because it has a generally accepted meaning.  Legal treatises uniformly define "surface waters" as waters that "fall on the land from the skies or arise in springs and diffuse themselves over the surface of the ground, following in no defined course or channel."  93 C.J.S. *Waters* § 254 (2012); see also  78 Am. Jur. 2d *Waters* § 174 (2012) ("The term 'surface water' is . . . generally defined as that which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state or condition."),  Black's Law Dictionary, 1729 (9th ed. 2009) ("Water lying on the surface of the earth but not forming part of a watercourse or lake. . . . Surface water most commonly derives from rain, springs, or melting snow."), COUCH ON INS. § 153:49 (". . . [A] a flood is water that escapes from a watercourse, while surface water is water diffused over the surface of the land, without forming a body of water or following a channel." (footnotes omitted)).  None of these common definitions of "surface waters" would encompass the water which pooled on the surface of

9

Flamingo's deck.

Flamingo lastly argues that the district court's interpretation of the policy would lead to what it deems the "absurd result" of a gap in coverage in which waters may be excluded from coverage under both SFIP and all-risk policies. Even if that is so, the Court must enforce the terms of the policy. St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC, 572 F.3d 893, 898 (11th Cir. 2009).

In summary, rainwater that accumulated on Flamingo's deck is not surface waters under the SFIP.

II.    Flamingo's Alternate Theory

Flamingo also argues that flood surface waters backed up from ground level through a drain pipe, onto the elevated deck and then into the lobby. Selective does not dispute that there would be coverage for such an event; it disputes that it occurred. The District Court struck the testimony of Rene Basulto, Flamingo's key expert witness, based on untimely disclosure. It then granted summary judgment to Selective.

A.    The District Court's Striking of Basulto's Expert Declaration

Flamingo argues that Rene Basulto's opinion was timely disclosed in his June 23, 2011 declaration and that the district court erred in striking it. After considering the Southern District of Florida's local rule pertaining to disclosure of expert reports, certain undisputed facts in the record, and the date of disclosure of Basulto's opinion, we conclude that Basulto's opinion was not timely disclosed. As discussed below, his June 23 declaration was not "solely in rebuttal" to the opinion of John Pistorino, Selective's expert witness, as expressed in Pistorino's June 6 affidavit. Under Local Rule 16.1, Basulto's expert opinion should have been disclosed by May 13, 2011. The June 23 disclosure was untimely. This conclusion is not an exercise of judicial discretion; it is simply an application of the local rule to the facts. We review the District Court's decision on this point de novo.

Southern District of Florida Local Rule 16.1(k) provides:

Where expert opinion evidence is to be offered at trial, summaries of the expert's anticipated testimony or written expert reports . . . shall be exchanged by the parties no later than ninety (90) days prior to the pretrial conference . . . provided, however, that if the expert opinion evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party's expert, then the expert summary or report for such evidence shall be served no later than 30 days after the expert summary or report is served by the other party.

S.D. Fla. L.R. 16.1(k).

11

The undisputed facts concerning Flamingo's deck and its drainage system are the following:

The South Tower of Flamingo's condominium building, at issue here, has an elevated lobby with an adjacent 30,000 square foot promenade deck.  The deck surface has an upper area and a contiguous sunken area which adjoins the condominium lobby through a glass door.  The entire deck forms the ceiling for the garage below.  The upper deck surface is about ten feet above ground level.  The garage floor is about two feet below ground level.  Entry to the garage is down a ramp from a ground level parking lot.

The slope of the deck is such that water drains toward the sunken level.  As described in the expert reports, there are three deck drains in the sunken level of the deck which empty water through one or more vertical pipes down to a pump basin. The pump basin is in the pump room in the garage.  As accumulated water reaches the top of the pump basin, a hydraulic pump or pumps[3] force the water to an overhead outflow pipe.

---

[3]When the garage was originally constructed in 2001, the plans called for two hydraulic pumps.  When Carlos Perez was hired by Flamingo in late 2010, his inspection revealed one hydraulic pump which was nonfunctional.  There is no evidence in the record as to whether there were one or two hydraulic pumps in place on the day of the flood and whether or not there was any operational pump in place.

There are numerous deck drains in the upper deck.  Some of these drains connect to a system of pipes under the deck which feed into the same outflow pipe as does water from the hydraulic pump.  The outflow pipe slopes downward and ultimately goes through the garage wall.  It continues underneath the outdoor parking lot surface to one or more underground catch basins which feed water to underground drainage wells.  The parking lot surface has manholes over each catch basin.  The manholes are capped by grates through which water can drain.

On January 10, 2011, the district court entered a revised scheduling order setting June 1 as the deadline for conducting discovery and June 6 as the deadline for filing all motions.  Under S.D. Fla. L.R. 16.1(k), the parties were required to exchange expert witness disclosures by May 9, 2011, 90 days before the pretrial conference which was set by the scheduling order for August 5.  The parties agreed to extend the exchange date to May 13, 2011, and also to extend the date set by Local Rule 16.1(k) for disclosing rebuttal expert reports to June 13, 2011.

Timely expert witness disclosures were made by both sides on May 13, 2011.  Flamingo designated Carlos Perez, a plumbing contractor, as an expert witness.  Selective designated John Pistorino, an engineer, as an expert witness.[4]  Selective

---

[4]There were issues besides the coverage issue discussed in this opinion which involved other experts.  Reference to these other experts and their reports is omitted.

previously had provided to Flamingo a report by Pistorino entitled "Evaluation of Water Damage Claim." On May 13, it provided another report entitled "Supplemental Report Evaluation of Water Damage Claim." Pistorino's initial report concluded that rainwater had drained from the upper deck to the sunken area and then into the lobby. It stated: "This type of water is associated with a drainage problem having to do with design or maintenance of the Roof Deck drainage system. Rising waters from a ground source or other ground conditions did not occur here." Report at 5. The report concluded "the Lobby Area is not considered to be a flood event," id. at 15, though it nonetheless went on to estimate the dollar amount of damage to the lobby.

Pistorino's Supplemental Report noted that after his original report had been issued, the "owner's representatives" had asserted that water flow into the lobby had been caused by water backups from three drains in the sunken area which had stopped draining due to flooding in the garage below. In that regard, the Supplemental Report found that rainwater from the pipes below the three drains in the sunken area

> would simply spill into the pump room below and contribute to the water that was in the floor of the garage. No measurable restriction of flow out of these pipes could be realized unless the water level in the garage reached the underside of the elevated deck where the drains are located. . . . Rising waters from a ground source or other ground conditions did not occur here.

Pistorino Supplemental Report at 4.

14

On May 13, 2011, Flamingo provided to Selective the expert report of Carlos Perez. The gist of this report is that the damage was caused by the backup of water from the deck drains which flowed out onto the deck and then into the lobby. The water backed up because the catch basins were filled to capacity, restricting the speed with which the water could flow to the underground wells. Also, the intensity of the storm limited the speed with which the system could convey water to the catch basins. Perez Report at 1-2.

On May 31, 2011, Selective took Carlos Perez's deposition. This deposition is in the record and was relied upon by the district court in ruling on Selective's motion for summary judgment. In the deposition Perez explained his opinion. He began by stating that Flamingo's representative told him when he was hired as an expert witness in December 2010 that dirty water had been seen on the deck on the day of the flood,[5] raising the possibility that water had come up from the garage on the day of the flood. He later decided that heavy drainage through the outflow pipe from the upper deck drains when mixed with the water being forced upward from the hydraulic pump could have caused water in the outflow pipe to flow back out onto

---

[5]There is no direct evidence in the record that any dirty water was seen on the deck on the day of the flood.

15

the deck through the upper deck drain openings.  Perez termed this explanation a

"mechanical possibility."  Perez Dep. at 80-81, 108-109.

On June 6, 2011, Selective filed its motion for partial[6] summary judgment.  It

argued that water damage to the lobby had not been caused by a "flood" as that term

is defined in the relevant policy because rainwater on the deck did not constitute

flood "surface waters" as required by the policy.  Also, there was no evidentiary basis

for a conclusion that the lobby damage was caused by flood water from deck drains

which backed up and spilled into the lobby.  Selective's arguments were supported

by a June 6, 2011 affidavit of John C. Pistorino, which said:

> 4.    In the course of my investigation and meetings at the site, I was
>       provided information by FLAMINGO representatives that the rain
>       water entered the condominium lobby area from a two level
>       exterior deck through an exterior entry door flush with the lower
>       deck.  The exterior deck is approximately 10 feet above the floor
>       of the underlying garage and pump room.

> 5.    During subsequent site visits and meetings with FLAMINGO
>       representatives I was advised that not only did rainwater from the
>       decks come into the lobby, but also that water somehow was
>       pumped up and came out of the drains located on the decks from
>       the underlying garage area and pump room.  At first, I was told
>       that the involved drains were on the lower deck; subsequently I
>       was told that the involved drains were on the upper deck.

---

[6]This motion did not address claims pertaining to damage in the garage and in the spa area.
Apparently, these claims were settled while Selective's motion for partial summary judgment was
pending.

16

6.    Upon being given this information, I conducted further investigation to determine the validity of such claims, including an in depth inspection of the drainage system at issue. I also performed hydraulic calculations to determine the validity of these assertions. My investigation, analysis and calculations confirmed that it was not possible for water from below the deck, emanating from the pump room and garage, to have come up out of the drains onto either of the two upper decks.

7.    Attached hereto are my reports confirming these conclusions: The first is my initial Evaluation of Water Damage Claim (Exhibit "B" hereto); the second is the Supplemental Report of the Evaluation of Water Damage Claim at Flamingo South Beach I Condominium (Exhibit "C" hereto) in which I address issues relating [to] the drainage system generally and particularly address the assertion that was being made at that time that water came up out of the drains on the lower deck; and the third is my Rebuttal Report of the Evaluation of Water Damage Claim at Flamingo South Beach I Condominium (Exhibit "D" hereto), in which I address the later claim that water came out of the drains on the upper deck.

8.    As set forth in detail in those Reports, it is my expert opinion that none of the water which seeped into the condominium lobby from the two decks could have come up out of the drains from the garage and pump room.

9.    It is my expert opinion that the waters which entered the lobby and adjoining areas were in no way proximately caused by flood waters which may have come into the garage and pump room approximately 10 feet below the exterior decks.

Pistorino's Rebuttal Report, as referenced in his affidavit, was first disclosed

to Flamingo on June 6 when it was filed in support of Selective's motion for summary

judgment. This Rebuttal Report was in rebuttal to Perez's expert report which had

17

been disclosed on May 13.  The disclosure of Pistorino's Rebuttal Report was therefore timely.  The Rebuttal Report expressed, based on Pistorino's hydraulic calculations (based on the assumed presence of two functioning hydraulic pumps) and water flow calculations for the outflow pipe, that backed up water flowing from the upper deck drain pipes onto the deck was not mechanically possible.

Flamingo filed a cross-motion for partial summary judgment on June 6, 2011.  In this motion, Flamingo moved for summary judgment solely on Selective's affirmative defenses of failure to mitigate damages and failure to timely submit a Proof of Loss, and the issue of whether a general condition of flooding existed in the spa and garage areas of the condominium property.  Flamingo did not rely on expert disclosures in support of this motion for partial summary judgment, though it did rely on the deposition of Denis Solano in describing the severity of the storm.

Flamingo took Pistorino's deposition on June 10, 2011, apparently with the consent of Selective.  The deposition is in the record.  Pistorino gave testimony consistent with the opinions earlier expressed in his various reports and his affidavit.

On June 23, 2011, Flamingo filed a pleading entitled Response in Opposition to Defendant's Motion for Partial Summary Judgment, Cross-Motion for Partial Summary Judgment, and Incorporated Memorandum of Law.  In support of its response to Selective's motion and also in support of its own second cross-motion,

18

Flamingo filed the declarations of Rene Basulto and Carlos Perez. This was the first time Basulto had been identified as an expert witness.

The gist of Basulto's declaration was: on the day of the flood the catch basins in the parking lot were saturated with ground water, which would have slowed the water flow in the outflow pipe; flood water would have been discharged from the catch basins onto the surface of the parking lot; the flood water would have run from the parking lot down the ramp into the garage; the flood water in the garage would have entered the pump room and the pump basin, activating the pumps; the pumps would have forced the flood water upward into the "already saturated outflow pipe," which would have caused water to flow out onto the upper deck and from there to the sunken level and into the lobby. Basulto Decl. at 2-3. Basulto also opined that Pistorino had miscalculated the slope of the outflow pipe; the actual, lesser slope would slow the rate of drainage. Perez's supporting declaration contained the calculation of slope which Basulto relied on. Perez also adopted Basulto's assertion that the water in the pump room would have entered the pump basin on account of the flooding of the garage. He offered as verification his observation of a "visible water line" in the pump room. Perez Decl. at 1-2.

On July 1, 2011, Selective filed a motion to strike Flamingo's second cross-motion for partial summary judgment on grounds that it had been filed beyond the

19

June 6 cutoff for filing motions.  It also moved to strike the declaration of Basulto on grounds that Basulto had not been identified as an expert witness within the Court's deadline or as extended by agreement of the parties.  Therefore, Selective had been deprived of the opportunity to depose Basulto.  In an order entered July 8, 2011, the court struck Flamingo's second cross-motion for partial summary judgment because it had been filed late and struck Basulto's declaration because his expert opinion had not been timely disclosed.

In an order of August 5, 2011 the district court granted Selective's motion for summary judgment and entered final judgment in its favor.

Basulto's June 23 declaration did undermine, and in that sense sought to rebut Pistorino's water flow calculations which were set forth in Pistorino's June 6 affidavit and attached June 2 Rebuttal Report.  However, Basulto's declaration was not solely for that purpose.  Basulto also enlarged Perez's original theory by adding an assertion that some of the water that entered the lobby originated as parking lot flood waters which flowed to the garage, entered the pump basin, and were pumped upwards back through the upper deck drains.  Basulto's declaration adopted Perez's original opinion that slow movement of the water in the outflow pipe contributed to the drainage backup.  This was not in rebuttal to Pistorino's June 6 affidavit or in rebuttal of any of Pistorino's expert reports which were referenced in Pistorino's affidavit.  Plaintiff's

late addition of Basulto was in reality an effort to substitute Basulto as Plaintiff's expert witness in place of Perez.

Although Basulto's opinion was not timely disclosed, the district court had the discretion to allow it. We review the striking of the declaration for abuse of discretion. OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1360 (11th Cir. 2008). "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1226 (11th Cir. 2005).

Flamingo argues that, assuming Basulto's opinion was not timely disclosed, the late disclosure was substantially justified or harmless such that striking the expert declaration was an inappropriate sanction. Flamingo argues that: (1) Basulto's declaration creates a genuine issue of material fact as to whether the a drain backup caused flooding; (2) Basulto's declaration could not have been offered prior to Pistorino's June 6, 2011 Rebuttal Report because it refutes the engineering opinions contained therein; and (3) Selective would not be prejudiced because the declaration was disclosed four months prior to trial, and less severe sanctions, such as re-opening discovery could have cured any prejudice.

21

While it may be that Basulto's declaration would have created a material issue of fact precluding summary judgment (because it undermined Pistorino's water flow calculations), it is also true that the opinions expressed in his declaration could and should have been formulated much earlier within the time set for discovery, based on an examination of Flamingo's premises and the plans for the premises which were available for inspection. Flamingo did not need to wait for Pistorino's affidavit or Rebuttal Report to do this. Flamingo has not provided justification for its delay. Especially given that the discovery and motions schedule had been pushed back once already, and a rescheduling of all deadlines would have been necessary to accommodate Basulto's deposition, we cannot say that the belated disclosure was harmless. Finally, we cannot say that Flamingo suffered manifest injustice when Basulto's declaration was struck. Accepting the declaration at face value, it leaves many loose ends. It is based on an assumption that the hydraulic pumps were operational on the day of the flood. Also, there is no direct evidence that anyone saw dirty water on the deck. Basulto's declaration does not dispute Pistorino's hydraulic calculations and offered no water flow calculations of his own. Overall, Basulto's declaration is an assertion of a theory, not an explanation based on demonstrated facts.

22

The district court did not abuse its discretion in striking Basulto's declaration based on untimely disclosure of his opinion.

    B.    The District Court's Grant of Selective's Motion for Summary Judgment

Flamingo lastly argues that a genuine issue of material fact remains as to whether the damage to the lobby is covered notwithstanding the SFIP's exclusion of coverage for loss caused by "[w]ater or water-borne material that: . . . backs up through sewers or drains; . . . unless there is a flood in the area and the flood is the proximate cause of the sewer or drain backup . . . ."  Policy, § V.(D)(5).  The parties agree that there was a flood in the area, including the garage below the deck. Therefore, Flamingo urges that an issue of fact remained for trial regarding whether this flooding in the garage was the proximate cause of water backing up through the drains onto the deck and subsequently entering the lobby.  The only evidence in the record on this point is the deposition of Flamingo's expert, Carlos Perez, Perez's expert report, which he testified about in his deposition, and Perez's declaration.

We review the district court's grant of summary judgment de novo construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor.  Eli Lilly & Co. v. Air Exp. Int'l USA, Inc., 615 F.3d 1305, 1313 (11th Cir. 2010).  We may grant summary judgment only after determining that "there is no genuine dispute as to any material fact and [that] the

23

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is not "genuine" if it is unsupported by the evidence or is created by evidence that is "merely colorable" or "not significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party.  Id. at 252.

The drainage system of the deck, as described *supra* Part II.A., and viewed in the light most favorable to Flamingo, directs water from the deck, through a series of pipes and pumps located in the parking garage, to basins in the outdoor parking lot. The sunken level of the deck contains three drains which empty water through one or more vertical pipes down to a pump basin.  As accumulated water reaches the top of the pump basin, a hydraulic pump or pumps force the water to an overhead outflow pipe.  There are additional deck drains in the upper deck.  Some of these drains connect to a system of pipes under the deck which feed into the same outflow pipe as does water from the hydraulic pump.  The outflow pipe slopes downward and ultimately goes through the garage wall to one or more underground catch basins which feed water to underground drainage wells.

24

Flamingo maintains that the flooding in the garage caused the pump(s) in the garage to activate and pump water into an already saturated system, causing water in the outflow pipe to discharge back onto the elevated deck. Flamingo believes this caused an accumulation of water which then seeped into its lobby. Selective's expert, John Pistorino, repeatedly asserts that no drain backup occurred. Regarding the possibility of water backing up through drains from the garage floor, Pistorino's report indicated, "Such a backup could not have taken place as the Roof Deck drains in the promenade are a full 12 feet above the floor of the garage and hydraulically this could not have occurred." Pistorino Report at 9. Pistorino further opined that:

> While it is conceivable that individual drains may have temporarily become overwhelmed with the quantity of water trying to enter the system, the actual amount of water entering the main pipe line of the drainage system is such that the main pipe would have always discharged out the south end of the garage building into the parking lot drainage system.

Pistorino Rebuttal Report at 4.

Flamingo claims that its expert submissions refute this evidence and raise a question of material fact as to whether such a backup did occur. The only expert opinion timely disclosed by Flamingo is that of Carlos Perez. In the three sentences related to the backup theory in his report, Flamingo's expert, Carlos Perez, states:

> On the day of the flood, due to the intensity of the storm, the catch basins filled to capacity. This restricted the speed in which the system

25

conveys water from the catch basins to the wells. . . .  The intensity of the storm limited the speed in which this system can convey storm water to the catch basins . . . .  In my opinion, the water intrusion into the Flamingo lobby was a result of the backup described above [the backup of water from the sundeck drains into Flamingo's lobby], coupled with the pooling of storm water on the lower portion of the upper pool deck.

Perez Report at 2.  Regarding the water backup theory, Perez said the following in his deposition:

Q:    Are you sure that the dirty water [that flooded the lobby] came from the pumps?
A:    I'm saying that the mechanical possibility of it happening could happen.  I think the sunken area was challenged.

Perez Dep. at 108.  In light of the testimony offered by Perez, the district court correctly concluded that "[A]t best, Plaintiff has put forth evidence that a drain backup on the day of the storm was mechanically possible."[7]  Flamingo S. Beach I Condo. Ass'n Inc., No. 10-CV-21840-KING, at *11 .  The opinion that a backup was "mechanically possible" provides a mere scintilla of evidence, which is insufficient for overcoming summary judgment on its claim.  Flamingo failed to produce a sufficient amount of evidence to create a genuine issue of fact for trial.

**CONCLUSION**

We AFFIRM the district court's grant of summary judgment to Selective.

---

[7]This conclusion is not undermined by Perez's declaration, which was offered to support Basulto's declaration.

26