No. 2--00--0936

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

WARREN D. SMITH and ) Appeal from the Circuit Court

JOYCE M. SMITH, ) of Kane County.

)

Plaintiffs-Appellants, )

) No. 97--L--575

v. )

)

UNION AUTOMOBILE )

INDEMNITY COMPANY, ) Honorable

) Patrick J. Dixon,

Defendant-Appellee. ) Judge, Presiding.

_________________________________________________________________

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, Warren and Joyce Smith, filed suit against defendant, Union Automobile Indemnity Company (Union), following Union's denial of a claim plaintiffs submitted under their homeowner's policy.  The circuit court of Kane County granted summary judgment in Union's favor.  Plaintiffs appeal, arguing that the trial court (1) should have denied Union's motion for summary judgment and granted plaintiffs' cross-motion for partial summary judgment pursuant to the "mend the hold" doctrine; (2) incorrectly determined that the damage to plaintiffs' home was caused by surface water and was thus excluded from coverage; (3) misallocated the burden of proof; and (4) should have barred Union from filing its counterclaim for declaratory judgment.

BACKGROUND

During a 24-hour period on July 17 and 18, 1996, northeastern Illinois was deluged with 17 inches of rain.  During this storm, the window wells in the basement of plaintiffs' Aurora home filled with water, causing the windows to break and the basement to fill with five feet of water.  Water also came into the basement through the sewer drain.   At the time of the storm, plaintiffs had a homeowner's policy with Union.  The policy included a special endorsement with a policy limit of $5,000 that provided coverage for loss caused by sewer or drain backup.  Plaintiffs did not purchase flood insurance from Union.  When plaintiffs filed a claim with Union for the damage caused by the water that flooded their basement, Union paid them $5,000 pursuant to the special endorsement but denied full coverage for plaintiffs' loss pursuant to the following exclusion:

"1. We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss

* * *

c. 
Water Damage
, meaning:

(1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind[.]"

In the letter denying coverage, Union's representative, Frederic Lauher, set forth the water damage exclusion and stated that Union's understanding was that the damage to plaintiffs' home was caused "when sewage backed up through the drains of your house; the sump pump was not capable of handling the subsurface water causing water to back up through the sump; and surface water entered the dwelling from flooding of Blackberry Creek."

After Union denied full coverage, plaintiffs filed suit against Union.  Count I of plaintiffs' first amended complaint alleged breach of contract and count II sought attorney fees, costs, and damages under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 1998)).  Following discovery, Union moved for summary judgment.  The basis of the motion was that the damage to plaintiffs' home was caused by flood and surface water so no coverage existed pursuant to the policy's water damage exclusion.  Union also filed a counterclaim for declaratory judgment based upon the water damage exclusion.  Plaintiffs filed a cross-motion for partial summary judgment that argued that (1) Union should be barred, pursuant to the "mend the hold" doctrine, from asserting that surface water caused plaintiffs' loss because it had not previously specified that part of the exclusion as a defense; and (2) the water that flooded plaintiffs' basement was not surface water.

The trial court rejected plaintiffs' arguments and granted summary judgment in Union's favor as to count I of the first amended complaint.  The court also denied plaintiffs' cross-motion for partial summary judgment and dismissed Union's counterclaim.  Subsequently, the trial court denied plaintiffs' motion to reconsider and dismissed count II of the first amended complaint with prejudice.  This appeal followed.

ANALYSIS 

We begin by noting the appropriate standard for reviewing a trial court's decision to grant a motion for summary judgment.  Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with any affidavits, demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 1998).  A court considering a motion for summary judgment must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the nonmoving party.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 131-32 (1992).  A court should grant summary judgment only when the movant's right to judgment is clear and free from doubt.  When reasonable people could draw divergent inferences from undisputed facts, summary judgment should be denied.  
Outboard Marine
, 154 Ill. 2d at 102.  Our review of a trial court's summary judgment ruling is 
de novo
.  
Outboard Marine
, 154 Ill. 2d at 102.

First, we address plaintiffs' assertion that the "mend the hold" doctrine precluded Union from presenting the defense that the water that entered plaintiffs' basement was surface water.  The doctrine's name, which is derived from a nineteenth-century wrestling term (
Harbor Insurance Co. v. Continental Bank Corp.
, 922 F.2d 357, 362 (7th
 Cir. 1990)), prohibits a party who has repudiated a contract on one ground from changing his ground after litigation has begun and thus " 'mend[ing] his hold.' "  
Larson v. Johnson
, 1 Ill. App. 2d 36, 39-40 (1953), quoting 
Ohio & Mississippi Ry. Co. v. McCarthy
, 96 U.S. 258, 267-68, 24 L. Ed. 693, 696 (1878).  

During discovery, Union's expert, T. Michael Toole, gave the opinion that the water that damaged plaintiffs' home was a combination of "flood surface waters associated with the overflowing of Blackberry Creek and accumulated surface waters from the field located just west of the property."  Plaintiffs' expert, Eugene Holland, disagreed that any part of the water came from Blackberry Creek.  Holland concluded as follows:

 "The water that entered Mr. and Mrs. Smith's basement windows was rain water or water on land whose natural absorption was prevented by and/or whose flow was altered and diverted from its natural flow by manmade objects and constructions to the east of the insured premises, including without limitation streets, other paved surfaces, houses and associated construction and landscaping." 

In its motion for summary judgment Union asserted that flood and surface water caused the damage to plaintiffs' home and that such losses were excluded under the water damage exclusion.  Similarly, in its counterclaim Union alleged that the water damage was caused by one or more of the events excluded under the water damage exclusion, "i.e., 'flood, surface water,' etc."  Plaintiffs contend, as they did in the trial court, that, because Union initially stated that it based its denial of coverage on the understanding that the water in plaintiffs' basement was overflow from Blackberry Creek, it cannot change its position and assert that the water was surface water from another location.  We conclude that the "mend the hold" doctrine is inapplicable in this case for two reasons. 

First, the cases that have applied the doctrine involve situations in which the offending party changed the initial reason for not performing a contract to a completely different reason during litigation.  In 
Larson
, for example, the defendant initially relied upon the defense that the contract at issue had been procured through connivance, fraud, and misrepresentation.  
Larson
, 1 Ill. App. 2d at 38.  Later,  the defendant altered its position and argued that a lease provision in the contract was indefinite and therefore unenforceable.  
Larson
, 1 Ill. App. 2d at 39.   

In the insurance context, courts have precluded insurers from denying a claim on one basis and then changing the basis for denial during litigation.  In 
Coulter v. American Employers' Insurance Co.
, 333 Ill. App. 631 (1948), the court declined to consider the defendant insurer's argument that the insured failed to give proper notice of an accident when it had previously based its denial of coverage solely upon the contention that the accident at issue was outside the scope of the policy's coverage.  
Coulter
, 333 Ill. App. at 634, 641.  Similarly, in 
Townsend v. Postal Benefit Ass'n
, 262 Ill. App. 483 (1931), the defendant initially claimed that the plaintiff was not a member of the insured group at the time of her death but later asserted a completely different defense--the failure to give proper notice of the insured's death.  The court barred the defendant from asserting the latter defense.  

Here, Union has consistently asserted that plaintiffs' claim was not covered because of the water damage exclusion.  Unlike the insurers in the cases cited by plaintiffs, Union has never completely changed the reason for its denial of coverage.  Rather, it changed the factual basis for the defense on which it had always relied.  Initially, Union stated that the water in plaintiffs' basement was flood water from Blackberry Creek.  Union subsequently asserted that the water was a combination of flood water from Blackberry Creek and surface water.  In our view, the "mend the hold" doctrine does not extend to a situation where the insurer relies upon the same defense but with a different factual basis.  At all times plaintiffs were aware that Union was relying on the water damage exclusion.  Union did not switch positions midstream.

Second, plaintiffs have not demonstrated that they were surprised or prejudiced in any way by Union's assertion that  surface water, rather than overflow from Blackberry Creek, caused the damage.  Courts have refused to apply the "mend the hold" doctrine in the absence of unfair surprise or arbitrariness.  
William J. Templeman Co. v. United States Fidelity & Guaranty Co.
, 317 Ill. App. 3d 764, 771-72 (2000).  Union asserted in its answers to plaintiffs' complaints that the water was surface water.  Moreover, plaintiffs' expert specifically addressed the surface water issue.  Therefore we cannot say that plaintiffs were surprised or prejudiced in any way.  For this reason, we conclude that the trial court properly declined to apply the "mend the hold" doctrine with respect to Union's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment.

Next, we turn to plaintiffs' argument that the trial court erroneously concluded that the damage to plaintiffs' home was caused by surface water.  The resolution of this issue turns upon the definition of the policy term "surface water."  Plaintiffs contend that the term refers to  water flowing naturally whose flow has not been altered in any way by man-made structures.  Union maintains that surface water is simply rainwater that has fallen to the ground, without regard to whether its flow has been affected by man-made objects.  We do not find either party's definition to be sufficiently precise.   

The construction of an insurance policy's provisions is a question of law.  
Outboard Marine
, 154 Ill. 2d at 108.  When construing an insurance policy, a court must determine the intent of the parties to the contract.  
Outboard Marine
, 154 Ill. 2d at 108.  To accomplish this task, the court must construe the policy as a whole, considering the risk undertaken, the subject matter that is insured, and the purposes of the entire contract.  
Outboard Marine
, 154 Ill. 2d at 108.  If the policy's words are unambiguous, "a court must afford them their 
plain, ordinary, and popular meaning
."  (Emphasis in original.)  
Outboard Marine
, 154 Ill. 2d at 108.  A word's plain, ordinary, and popular meaning is " 'that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal [person], to a reasonable [person], to persons with usual and ordinary understanding, to a business[person], or to a lay[person].' "  
Outboard Marine
, 154 Ill. 2d at 115, quoting 2 Couch on Insurance  §15:18 (2d rev. ed. 1984).

With these principles in mind, we consider the definition of the term "surface water."  Plaintiffs do not contend that this term is ambiguous.  On the contrary, they contend that it unambiguously means water "flowing naturally."  Because the term "surface water" is not defined in the policy, we must ascertain its plain, ordinary and popular meaning.  
Outboard Marine
, 154 Ill. 2d at 115.  Our research has not revealed any Illinois case that has squarely addressed and defined the term.

Webster's Dictionary defines "surface water" as "natural water that has not penetrated much below the surface of the ground: drainage water."  Webster's Third New International Dictionary 2300 (1986).  Black's Law Dictionary contains the following definition of "diffused surface water": 

"Water, such as rainfall runoff, that collects and flows on the ground but does not form a watercourse.  Surface water is [usually] subject to different regulations from water flowing in a watercourse. -- Often shortened to 
surface water
."  Black's Law Dictionary 1585 (7th
 ed. 1999).  

We have reviewed cases from other jurisdictions that have considered the definition of "surface water" and find that those courts have arrived at definitions that substantially agree with the definitions quoted above.  Generally, the cases define "surface water" as water that (1) derives from natural precipitation such as rain or melting snow; (2) flows over or accumulates on the surface of the ground; and (3) does not form a definite body of water or follow a defined watercourse.  
Ebbing v. State Farm Fire & Casualty Co.
, 67 Ark. App. 381, 385-86, 1 S.W.3d 459, 461-62 (1999); 
Heller v. Fire Insurance Exchange
, 800 P.2d 1006, 1008-09 (Colo. 1990); 
 
Cochran v. Travelers Insurance Co.
, 606 So. 2d 22, 24 (La. App. 1992); 
Georgetowne Square v. United States Fidelity & Guaranty Co.
 3 Neb. App. 49, 54-55, 523 N.W.2d 380, 384-85 (1994); 
Casey v. General Accident Insurance Co.
, 178 A.D.2d 1001, 1002, 578 N.Y.S.2d 337, 338 (1991);
 
State Farm Lloyds v. Marchetti
, 962 S.W.2d 58, 61 (Tex. Ct. App. 1997); 
State Farm Fire & Casualty Co. v. Paulson
, 756 P.2d 764, 768 (Wyo. 1988).

We note that none of these cases defines "surface water" as water whose flow has not been affected in any way by human construction.  While some of the cases refer to "natural drainage," or water "flowing naturally," those terms are used to distinguish surface water from water in a defined watercourse or a lake or pond.  There is no indication in the case law that "naturally" should be interpreted to mean completely untouched or unaffected by man-made structures.  It seems to us that if we did adopt plaintiffs' proposed definition, it would be nearly impossible for surface water to exist, given the highly developed state of our society and the fact that few places without roads or other man-made structures exist today.  This causes us to conclude that  plaintiffs' proposed definition of "surface water" does not reflect the popular and ordinary meaning of the term.  The average reasonable person would not limit surface water to water whose flow has not been altered in any way by paved surfaces, buildings, or other structures. 

The cases plaintiffs rely upon do not support their proposed definition of "surface water."  Plaintiffs rely primarily upon 
Heller
, a Colorado case.  In that case, the Colorado Supreme Court defined "surface water" as follows:

"Water from melted snow, falling rain, or rising springs, lying or flowing naturally on the earth's surface, not gathering into or forming any more definite body of water than a mere bog, swamp, slough, or marsh, and lost by percolation, evaporation or natural drainage.  Surface water is distinguished from the water of a natural stream, lake, or pond, is not of a substantial or permanent existence, has no banks, and follows no defined course or channel."  
Heller
, 800 P.2d at 1008-09.  

The court held that water diverted by man-made trenches 3 feet wide and 15 to 20 feet long was not surface water.  It determined that the trenches were "defined channels" and that the runoff lost its character as surface water when it was diverted by the trenches. 
Heller
, 800 P.2d at 1009.  The court did not hold that water whose flow was altered in any way by a man-made object ceased to be surface water; rather, that distinction was lost only when the water became part of defined channels.  Plaintiffs' proposed definition is much broader than that set forth in 
Heller
.  Accordingly, we disagree with plaintiffs that 
Heller
 supports their definition of "surface water."

Likewise, we find distinguishable 
Cochran
, a Louisiana case, and 
Ebbing
, an Arkansas case, both relied upon by plaintiffs.  In both of these cases, the courts concluded that the water at issue did not meet the definition of "surface water."  Their conclusions, however, did not suggest that 
any
 artificial alteration of water flow transformed surface water into something else.  In 
Cochran
, the court held that rainwater that seeped into a building from the roof, gutters, and metal capping on the roof was not surface water because it was not water that collected and lay on the ground.  
Cochran
, 606 So. 2d at 24.  In 
Ebbing
, the court held that water from a burst water main was not surface water because it did not accumulate through natural causes.  
Ebbing
, 67 Ark. App. at 385-86, 1 S.W.2d at 461-62.  Neither of these cases is at all similar to the case before us.

Consequently, plaintiffs have not convinced us that the plain and ordinary meaning of "surface water" is limited to water that is completely unaffected by man-made constructions.  We decline to define surface water so broadly.  Instead, we conclude that surface water means water derived from natural precipitation that flows over or accumulates on the ground without forming a definite body of water or following a defined watercourse.

With that definition in mind, our next task is determine if a genuine issue of material fact existed regarding whether the water that damaged plaintiffs' home was surface water.  If we apply the definition of "surface water" we adopted above, it is apparent that no genuine issue of material fact existed. It was undisputed that the water that entered plaintiffs' basement was in part rainwater or runoff that accumulated as a result of a torrential rainstorm.  There was no evidence that the water emptied into plaintiffs' basement from a defined waterway or channel.  Accordingly, we agree with the trial court that there was no genuine issue of material fact as to whether the water in plaintiffs' basement met the definition of "surface water." Therefore, Union was entitled to judgment as a matter of law under the policy's water damage exclusion.

Next, we address plaintiffs' contention that the trial court misapplied the burden of proof in deciding Union's motion for summary judgment.  According to plaintiffs, the trial court relied on testimony from plaintiffs' expert on an issue for which Union had the burden of proof.  Plaintiffs point to the following language in the trial court's order:

"It is the position of the plaintiffs that this surface water was changed to something other than surface water prior to entering plaintiffs' dwelling."

The court then went on to note that there was no evidence that the physical characteristics of the water were changed or that the water did anything other than spread across the ground without following a defined channel prior to entering plaintiffs' basement. 

We fail to see how these statements by the trial court switched the burden of proof to plaintiffs.  The court merely set out plaintiffs' argument in opposition to Union's motion and decided that there were no material facts showing that the water was anything but surface water.  Accordingly, we find no merit to this argument.

Plaintiffs' next contention is that the trial court erred in allowing Union to file its counterclaim for declaratory judgment.  The trial court dismissed the counterclaim after granting summary judgment to Union.  In light of our affirmance of the order granting Union summary judgment, the counterclaim is irrelevant.  Plaintiffs, however, contend that it is relevant because Union requested summary judgment on the counterclaim and it was improper for the trial court to grant summary judgment on a pleading that was dismissed.  It is true that Union stated in the introduction to its summary judgment motion that it was seeking summary judgment "with respect to Union's Counterclaim for Declaratory Judgment."  It is unclear to us why Union would ask for summary judgment on its counterclaim instead of on plaintiffs' complaint.  Nonetheless, it is clear from the record that the trial court treated Union's motion as if it sought summary judgment on the first amended complaint.  The court's order specifically stated that Union's summary judgment motion was granted as to count I of the first amended complaint.   Accordingly, we do not find it necessary to address whether it was proper for the court to allow Union to file the counterclaim.

Last, we note that in their reply brief plaintiffs contend that the trial court erred in dismissing count II of plaintiffs' first amended complaint with prejudice.  In the prayer for relief in their initial brief, plaintiffs requested that we reinstate count II.  However, plaintiffs did not argue this issue in their brief.  Supreme Court Rule 341(e)(7) clearly states that points not argued in an appellant's brief are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.  177 Ill. 2d R. 341(e)(7); see also 
Sylvester v. Chicago Park District
, 179 Ill. 2d 500, 507 (1997).  Thus, plaintiffs waived the issue of whether count II should be reinstated.

For the reasons stated, the judgment of the circuit court of Kane County is affirmed. 

Affirmed.

RAPP and BYRNE, JJ., concur.