COLORADO COURT OF APPEALS                                    2017COA15

Court of Appeals No. 16CA0456
Weld County District Court No. 15CV30103
Honorable Todd L. Taylor, Judge

Michael Martinez,

Plaintiff-Appellant,

v.

American Family Mutual Insurance Company, a Wisconsin Corporation,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division A
Opinion by CHIEF JUDGE LOEB
Davidson* and Plank*, JJ., concur

Announced February 9, 2017

Meier & Giovanini, LLC, Douglas Meier, Lakewood, Colorado, for Plaintiff-Appellant

Campbell, Latiolais & Averbach, LLC, Kirsten M. Dvorchak, Colin C. Campbell, Denver, Colorado, for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1    In this insurance coverage case, plaintiff, Michael Martinez, appeals the district court's entry of summary judgment, pursuant to C.R.C.P. 56(c), in favor of defendant, American Family Mutual Insurance Company (American Family).  We affirm.

## I.    Background and Procedural History

¶ 2    At all times relevant to this appeal, Martinez owned a home in Erie, Colorado.  The home had a finished basement with windows below the ground, which were surrounded by window wells.

¶ 3    On August 3, 2013, there was a severe thunderstorm in Erie. According to Martinez's complaint, some of the heavy hail and rain collected at the base of his window wells, and the hail at the base of the window wells prevented the accumulating rainwater from percolating into the ground.  As alleged by Martinez, the rainwater accumulated on top of the hail to such an extent that it eventually overflowed the basement windows, seeped into the basement, and caused substantial damage to his home and personal property.

¶ 4    Martinez filed a claim with his insurer, American Family.  After conducting an investigation, American Family concluded that the damage to Martinez's home was caused by either "flooding" or

"surface water," and was, therefore, expressly excluded from coverage under Martinez's insurance policy. American Family denied Martinez's claim on these grounds.

¶ 5    Thereafter, Martinez filed suit, seeking a declaratory judgment on the issue of coverage. Martinez also asserted claims for contractual and extra-contractual damages. American Family filed a motion for summary judgment on the issue of coverage, arguing that the insurance policy's water damage exclusion for "flood" and "surface water" applied, as a matter of law, to the damage to Martinez's home.

¶ 6    In a lengthy and thorough written order, the district court granted American Family's motion for summary judgment, concluding that the rain and hail that collected in the window wells was "surface water" and, thus, the loss from the resulting damage was excluded by the plain language of the insurance policy.

¶ 7    This appeal followed.

## II.    Standard of Review and Applicable Law

¶ 8    An insurance policy is a contract and, thus, its meaning is a question of law that we review de novo. *Grippin v. State Farm Mut.*

*Auto. Ins. Co.*, 2016 COA 127, ¶ 9. In construing an insurance policy, we apply well-settled principles of contract interpretation, *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003), and give effect to the intent and reasonable expectations of the parties thereto, *see Grippin*, ¶ 9. In addition, we read the provisions of the policy as a whole, construing the policy so that all provisions are harmonious and none is rendered meaningless. *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010).

¶ 9     We review an order granting a motion for summary judgment de novo. *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1212 (Colo. 2008). Summary judgment is appropriate only if the pleadings and supporting documentation demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c).

¶ 10     In support of its motion for summary judgment, the moving party carries the initial burden of demonstrating that there is no genuine issue of material fact. *Greenwood Tr. Co. v. Conley*, 938 P.2d 1141, 1149 (Colo. 1997). When a party moves for summary

judgment on an issue upon which the party would not bear the burden of persuasion at trial, the moving party's initial burden of production may be satisfied simply by demonstrating an absence of evidence in the record to support the nonmoving party's case. *Casey v. Christie Lodge Owners Ass'n*, 923 P.2d 365, 366 (Colo. App. 1996). "[O]nce the moving party has met its initial burden of production, the burden shifts to the nonmoving party to establish that there is a triable issue of fact." *Greenwood Tr.*, 938 P.2d at 1149. If the nonmoving party fails to meet this burden, summary judgment for the moving party should be granted. *Casey*, 923 P.2d at 366.

¶ 11    In reviewing an order granting summary judgment, we give the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 146 (Colo. 2007).

### III.    Analysis

¶ 12    On appeal, Martinez raises two contentions. First, he contends that damage to his basement and personal property was

not caused by "surface water."  Second, he contends that, even if the water was surface water, it lost that character when it entered the window wells.  Thus, Martinez argues that his policy did not bar coverage as a matter of law and that, accordingly, the district court erred in granting American Family's motion for summary judgment.

¶ 13     We note as a preliminary matter that Martinez's various versions of the events at issue changed over time.

¶ 14     Initially, on August 22, 2013, prior to the initiation of this lawsuit, Martinez told an American Family claims investigator that

> about a foot or two of hail . . . fell on the ground and fell into my window wells. [O]bviously the hail . . . seeped through the window . . . as it was melting, [and] that caused the water to come through the window and it flooded my basement out.

¶ 15     However, in his complaint, filed on February 6, 2015, Martinez alleged that his home

> incurred accidental direct physical loss as a result of a severe hail and rainstorm.  The hail was so heavy it filled the window wells not allowing rainwater to drain.  As a result, the rainwater that went directly into the window wells could not drain and entered the [home] through the windows.  The rain did not touch the ground and was above the surface of the

ground at all times before entering into the [home].

¶ 16    Thus, contrary to his initial claim, Martinez appeared to allege that the melted hail did not damage his home, but that rain *on top of the hail* did so.

¶ 17    Nine months after filing his complaint, in an affidavit filed with his response to American Family's motion for summary judgment, Martinez further elaborated on his more recent account.[1]  In his affidavit, Martinez averred as follows:

> On August 3, 2013 my home was hit by a hailstorm and rainstorm.  The hail was so heavy that it filled the window wells, not allowing rainwater to drain.  I also believe the gutters filled with hail so that rainwater ran off the roof and directly into the window wells.  As a result, rainwater that fell from the sky and ran off the roof went directly into the window wells and could not drain.  The rainwater never touched the ground and was never on the surface of the ground before entering my home and causing damage.

---

[1]  The district court determined that Martinez's affidavit was a sham, designed to create a material issue of fact where none existed.  We need not address this issue because, even assuming that the damage to Martinez's home occurred exactly as he alleged in the district court, we conclude that, as a matter of law, both the hail and rainwater in the window wells were surface water.

¶ 18 On appeal, Martinez reasserts the version of events contained within his complaint and affidavit. American Family argued below, and argues now on appeal, that, under any version of events alleged by Martinez, his insurance policy barred coverage as a matter of law.[2] For the reasons set forth below, we agree with American Family and conclude that the district court did not err in entering summary judgment.

## A. Relevant Policy Language

¶ 19 As a threshold matter, we must interpret the meaning of the insurance agreement underlying the parties' dispute. *Cyprus*, 74 P.3d at 299. Therefore, to begin, we set forth below the pertinent policy provisions.

¶ 20 Martinez's home insurance policy with American Family was an all-risk policy, which was designed to cover a wide range of damages to the insured's home and property unless coverage for a particular type of loss or damage was expressly excluded under the

---

[2] On appeal, Martinez does not argue that summary judgment was improper because there were disputed issues of material fact. Rather, he contends that the district court erred in granting summary judgment by concluding as a matter of law that the water that damaged his house and property was "surface water."

policy. *See Novell v. Am. Guar. & Liab. Ins. Co.,* 15 P.3d 775, 778

(Colo. App. 1999). As pertinent here, the following coverage

provisions were applicable:

> We cover risks of accidental direct physical
> loss to [the insured's home], unless the loss is
> excluded in this policy. . . .
>
> We [also] cover risks of accidental direct
> physical loss to [the insured's personal
> property] when caused by a [covered peril],
> unless the loss is excluded in this policy.

¶ 21    As evidenced by the language above, the policy contained

various exclusions. The specific provision relied on by American

Family as grounds for denying Martinez's claim stated:

> We do not ensure for loss caused directly or
> indirectly by any of the following. *Such loss is
> excluded regardless of any other cause or event
> contributing concurrently or in any sequence to
> the loss.* . . . [3]

---

[3] The language in this emphasized sentence of the exclusion
section of the policy is generally referred to as an anti-concurrent
cause provision. *See, e.g., Am. Family Mut. Ins. Co. v. Schmitz,* 793
N.W.2d 111, 113 (Wis. Ct. App. 2010) ("We side with American
Family's position that its anti-concurrent cause provision plainly
excludes coverage if an excluded risk causes the loss regardless of
the contributing causes at issue here."); *see also* 2 Randall G. Wick
& Finley Harckham, *Successful Partnering Between Inside and
Outside Counsel* § 25A:53, Westlaw (database updated Apr. 2016)
("[A]nticoncurrent clauses may bar coverage even if there is a

9. Water Damage, meaning:

> a. flood, *surface water*, waves, tidal water or overflow of a body of water, from any cause. . . .

(Emphasis added.)

¶ 22    Although American Family cited both "flood" and "surface water" as bases for denying Martinez's claim, the district court only applied the "surface water" exclusion in granting American Family's motion for summary judgment. Because we determine that the district court correctly concluded that the damage to Martinez's home and property was caused by "surface water," we need not address the applicability of the "flood" exclusion.

## B. *Heller*

¶ 23    The seminal Colorado case defining the term "surface water" in an insurance policy is *Heller v. Fire Insurance Exchange*, 800 P.2d 1006, 1007 (Colo. 1990). Both parties rely heavily on *Heller*, as did the district court in its summary judgment order.

¶ 24    In *Heller*, the plaintiffs owned a home in Vail, Colorado, and sustained substantial water damage to their property after runoff

---

covered cause of loss as long as an excluded clause can also be found anywhere in the relevant chain of events.").

9

from melting snow was diverted onto their land by three parallel trenches hidden behind their property, which were created by an unknown person. *Id.* Each trench was "fifteen to twenty feet long, three feet wide, [and] six inches deep," and all three were "lined with plastic sheets, rocks and tree limbs." *Id.*

¶ 25 The plaintiffs filed a claim with their insurer for their loss under their all-risk home insurance policy. *Id.* at 1008. The insurer, however, denied the claim after concluding that the damage was caused by either "flood" or "surface water," both of which were excluded perils under the policy. *Id.*

¶ 26 The plaintiffs then filed suit, seeking coverage under the policy. In response, the insurer moved for summary judgment, arguing that the policy did not cover the damage as a matter of law, based on the unambiguous surface water exclusion in the policy. *Id.* The trial court denied the motion, and the case was tried to a jury, which returned a verdict in favor of the plaintiffs.[4] On appeal, a division of this court reversed the judgment, *see Heller v. Fire Ins.*

---

[4] At trial, the insurer renewed its "surface water" exclusion argument in a motion for directed verdict, which was denied by the trial court. *Heller v. Fire Ins. Exch.*, 800 P.2d 1006, 1008 (Colo. 1990).

*Exch.*, (Colo. App. No. 87CA1045, Apr. 20, 1989) (not published

pursuant to C.A.R. 35(f)), holding that the water that caused

damage to the plaintiffs' property was surface water and that the

policy exclusion for surface water was applicable. *Heller*, 800 P.2d

at 1008. The Colorado Supreme Court granted certiorari.

¶ 27     In its opinion, the supreme court concluded that the term

"surface water" was not ambiguous even though it was not defined

in the policy itself. *Id.* at 1009. The court then provided the

following definition of surface water:

> Surface water is water from melted snow,
> falling rain, or rising springs, lying or flowing
> naturally on the earth's surface, not gathering
> into or forming any more definite body of water
> than a mere bog, swamp, slough, or marsh,
> and lost by percolation, evaporation or natural
> drainage. Surface water is distinguished from
> the water of a natural stream, lake, or pond, is
> not of a substantial or permanent existence,
> has no banks, and follows no defined course or
> channel.

*Id.* 1008-09 (footnotes omitted).

¶ 28     In applying its definition to the facts of the case, the court

concluded that the water that damaged the plaintiffs' property was

originally surface water. *Id.* However, the court held that the

11

surface water lost that character when it was diverted into the three man-made trenches. The court reasoned:

> Here, the water originated from natural runoff of melted snow, but was diverted into man-made trenches that . . . diverted the regular path of the melted snow over a natural ridge. These trenches were "defined channels" that diverted the regular flow of the water, preventing "percolation, evaporation, or natural drainage." In examining the characteristics of the water that damaged the [plaintiffs'] property, we conclude that the runoff lost its character as surface water when it was diverted by the trenches and therefore was not within the surface water exclusion contained in the [plaintiffs'] policy.

¶ 29    *Id.* 1009. Thus, because the water that damaged the plaintiffs' property was no longer "surface water," the court concluded that the plaintiffs' loss was covered by their insurance policy. *Id.*

¶ 30    We must apply the supreme court's definition of surface water in *Heller*. *See In re Estate of Ramstetter*, 2016 COA 81, ¶ 40. However, the material facts of this case differ significantly from those at issue in *Heller*, and, applying *Heller*'s definition, we must determine the following: (1) whether the roof of a building may be properly understood as "the earth's surface," such that it gathers surface waters; (2) whether "water from melted snow, falling rain, or

12

rising springs" encompasses water from melted hail; and (3) whether surface water that enters a window well loses that character, similar to the effect of the trenches in *Heller*. *See Heller*, 800 P.2d at 1008-09.

## C. The Damage To Martinez's Home And Property Was Caused By Surface Water

¶ 31 Although it is undisputed that water from the thunderstorm damaged Martinez's home, Martinez nevertheless contends that the water was not surface water as defined by *Heller*. In support of this contention, Martinez argues that: (1) the precipitation on the roof of his home was never "lying or flowing naturally on the earth's surface," *id.*, and therefore the water was not "surface water" prior to flowing directly into the window wells; (2) hail falls outside the ambit of precipitation contemplated by *Heller, id.*, and, accordingly, melting hail could not have been surface water; and (3) the rainwater at the base of the window wells also never "l[ied] or flow[ed] naturally on the earth's surface," because it collected on top of the hail. *Id.* at 1008. We disagree with each of these arguments.

¶ 32 We first conclude that the precipitation that fell onto the roof of Martinez's home fits well within *Heller*'s definition of surface

13

water.  Therefore, the precipitation was surface water prior to entering the window wells.  Although Martinez correctly points out that *Heller* defines surface water as that "lying or flowing naturally on the earth's surface," *id.*, the term "the earth's surface" is not as narrow as Martinez argues.

¶ 33     As a preliminary matter, we note that the "ground" is defined as "the surface on which man stands, moves, and dwells and on which objects naturally rest. . . .  [T]he earth as contrasted with the air" or water.  Webster's Third New International Dictionary 1002 (2002).  Here, Martinez's home is a surface upon which objects naturally rest and is readily contrasted with the air and bodies of water.  Accordingly, we view the rooftop of his home as a mere continuation of "the earth's surface," *see Heller*, 800 P.2d at 1008.

¶ 34     Moreover, our interpretation of the term "the earth's surface," *id.*, accords with the overwhelming majority of jurisdictions that have addressed this issue, which view precipitation collecting on a roof or other man-made structures as "surface water."  *See, e.g., Bringhurst v. O'Donnell*, 124 A. 795, 797 (Del. Ch. 1924) ("[T]he roof is to be regarded as an artificial elevation of the earth's surface.

14

When it intercepts the falling rain or snow, it therefore gathers surface waters."); *see also Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 966-67 (D.C. 1999) (relying on *Heller* and rejecting an argument that water accumulating on a man-made structure above the surface of the ground was not surface water); *Fenmode, Inc. v. Aetna Cas. & Sur. Co. of Hartford*, 6 N.W.2d 479, 480-81 (Mich. 1942) (concluding that water that pooled and overflowed from an artificial, paved surface was surface water); *Crocker v. Am. Nat'l Gen. Ins. Co.*, 211 S.W.3d 928, 936 (Tex. App. 2007) ("[A]n average reasonable person would not limit surface water to rain falling only on dirt and not on any paved surfaces or other structures.").[5]

¶ 35     In light of this jurisprudence and our view of the plain meaning of the term "the earth's surface," we conclude that the roof

---

[5] Although one court has distinguished man-made structures above the surface of the ground from the literal surface of the earth in analyzing an insurance policy's surface water exclusion, *see Cochran v. Travelers Ins. Co.*, 606 So. 2d 22, 23-24 (La. Ct. App. 1992) (concluding that rainwater that accumulated on a roof and seeped into the building was not surface water because it never collected or lay on the ground), a thorough review of the jurisprudence on this point reveals that *Cochran*'s holding is the minority view.

of Martinez's home qualifies as such. *Heller*, 800 P.2d at 1008. Thus, with respect to Martinez's argument that some precipitation fell onto his roof and then flowed directly into the window wells, we conclude that such water was surface water.

¶ 36    We next conclude that, to the extent Martinez argues that hail falls outside the scope of surface water precipitation contemplated by *Heller*, and therefore that none of the melting hail on his roof or in the window wells could have been surface water, he is incorrect. *Heller* merely provides a non-exhaustive list of the forms of precipitation that generate surface water, such as "melted snow, falling rain, or rising springs." *See id.*; *see also* Black's Law Dictionary 1825 (10th ed. 2014) ("Surface water most commonly derives from rain, springs, or melting snow."). Nothing in *Heller* suggests melted hail is different in this regard, and Martinez does not point to any court decision suggesting as much.

¶ 37    The dictionary definitions of "precipitation" and "hail" support our conclusion. Webster's defines "precipitation" as "a deposit on the earth of hail, mist, rain, sleet, or snow." Webster's Third New International Dictionary at 1784. Similarly, Webster's defines "hail"

16

as "precipitation in the form of small balls or lumps usu[ally] consisting of concentric layers of clear ice and compact snow produced by the oscillation of raindrops within cumulonimbus clouds or by the freezing of raindrops from nimbus clouds." *Id.* at 1019. Based on these plain-language definitions of the precipitation at issue in this case, we see no reason to treat hail as categorically excepted from the precipitation contemplated by *Heller*, 800 P.2d at 1008.

¶ 38    In analogous cases, other jurisdictions have concluded similarly, albeit in cases not expressly involving hail. For example, in *American Family Mutual Insurance Co. v. Schmitz*, 793 N.W.2d 111, 116 (Wis. Ct. App. 2010), the Wisconsin Court of Appeals addressed a nearly identical argument to that proffered by Martinez. In *Schmitz*, the plaintiffs contended that "the water that contributed to the collapse of [the] home was *rain water*, not surface water." *Id.* (emphasis added). The court disagreed: "To limit the definition of surface water to water that does not originate as rain would leave the term surface water without much meaning." *Id.* at 117; *see also Ebbing v. State Farm Fire & Cas. Co.*, 1 S.W.3d 459,

17

462 (Ark. Ct. App. 1999) (defining "surface water" as "water accumulating from natural causes"); *Crocker*, 211 S.W.3d at 931-32 (presuming that surface water is "natural precipitation" coming onto and passing over the surface of the ground).

¶ 39 Accordingly, we conclude that the melted hail on Martinez's roof, as well as the melted hail that allegedly fell directly into Martinez's window wells, was surface water. *Heller*, 800 P.2d at 1008-09.

¶ 40 Finally, because we have concluded that the melting hail in Martinez's window wells was surface water, regardless of how it arrived there, we reject his additional argument that the rainwater in his window wells, which allegedly accumulated on top of the hail, never "l[ied] or flow[ed] naturally on the earth's surface." *Id.* at 1008. Instead, we conclude as a matter of law that all of the precipitation that fell into Martinez's window wells — rain and hail — was surface water. There was no artificial distinction or demarcation between melting hail and rainwater.

## D. The Window Wells Did Not Change The Character Of The Precipitation As Surface Water

¶ 41    Relying on *Heller*, Martinez next contends that, even if the water in this case was surface water, it lost its character as surface water upon entering the window wells.  *See id.*  We disagree.

¶ 42    Because Martinez analogizes his window wells to the trenches at issue in *Heller*, *id.* at 1008-09, it is instructive to more fully articulate the *Heller* court's analysis of the trenches at issue in that case.  In *Heller*, the court ultimately concluded that, because the trenches changed the nature of the surface water, the damage to the plaintiffs' property was no longer excluded from coverage under the surface water exclusion.  *Id.* at 1009.  The court explained:

> Here, the water originated from natural runoff of melted snow, but was diverted into man-made trenches that were fifteen to twenty feet long and six inches deep.  The trenches diverted the regular path of the melted snow over a natural ridge.  These trenches were "defined channels" that diverted the regular flow of the water, preventing "percolation, evaporation, or natural drainage."  In examining the characteristics of the water that damaged the [plaintiffs'] property, we conclude that the runoff lost its character as surface water when it was diverted by the trenches and therefore was not within the surface water exclusion contained in the [plaintiffs'] policy.

19

*Id.* According to the supreme court, the trenches changed the character of the water from a diffuse state to a more definite body, and the trenches were therefore more akin to a watercourse, such as a "defined channel[]" or "stream, lake, or pond." *Id.* For this reason, the court could not readily characterize the water as surface water. *Id.*

¶ 43     Black's defines a watercourse as

> [a] body of water, usu[ally] of natural origin, flowing in a reasonably definite channel with bed and banks. The term includes not just rivers and creeks, but also springs, lakes, and marshes in which such flowing streams originate or through which they flow.

Black's Law Dictionary at 1825-26. By comparison, Webster's defines a trench as

> [a] narrow steep-sided depression eroded by a stream : CANYON, GULLY . . . [or,] a long straight comparatively narrow intermontane depression often occupied by parts of two or more drainage systems : TROUGH . . . .

Webster's Third New International Dictionary at 2438. When placed side by side, it is evident that watercourses and the *Heller* trenches shared nearly all of the same fundamental attributes. Thus, we

conclude that the dispositive characteristics of the *Heller* trenches were the following:

- the trenches' primary purpose of diverting water;

- the trenches' intentional prevention of "percolation, evaporation, or natural drainage;" and,

- the trenches' definiteness as "defined course[s] or channel[s]," made possible through their "banks."

*Heller*, 800 P.2d at 1008-09.

¶ 44    By contrast, Martinez's window wells are fundamentally different from the trenches described in *Heller, see id.* at 1007, and are even more unlike a watercourse.

¶ 45    First, the trenches in *Heller* "were fifteen to twenty feet long, three feet wide, [and] six inches deep." *Id.* On the other hand, photographs of Martinez's window wells in the record reveal that they are not long, narrow trenches; rather, the window wells are wide holes, several feet deep and a few feet wide.

¶ 46    Second, the trenches in *Heller* were "lined with plastic sheets, rocks[,] and tree limbs," *id.*, presumably to prevent drainage and to better channel the surface water.  Conversely, Martinez's window

21

wells were, according to his own account, designed to *hasten* natural percolation in order to prevent seepage and flooding into the basement.  That is, the window wells were not intentionally designed to collect water and divert it elsewhere.

¶ 47     Lastly, unlike the trenches in *Heller*, Martinez's window wells did not have banks.  Webster's defines a "bank" as "a mound, pile, or ridge raised by natural processes or artificial means above the surrounding level" that "often [has] a broad or long base and [a] flat top."  Webster's Third New International Dictionary at 172.  On the other hand, a window well is more appropriately understood as having below-ground siding designed to retain the surrounding soil.  We accordingly conclude that the factual circumstances of this case are so distinguishable from *Heller* that *Heller* does not compel us to conclude that the surface water here lost that character upon entering the window wells.

¶ 48     Indeed, in cases involving window wells, courts in other jurisdictions have held that a window well did not change the character of surface water that entered it.  For example, in *Smith v. Union Automobile Indemnity Co.*, 752 N.E.2d 1261, 1263 (Ill. App.

22

Ct. 2001), a severe rainstorm caused the window wells of the plaintiffs' basement to fill with water to such an extent that the windows broke and the basement flooded with five feet of water. *Id.* Water also came into the plaintiffs' basement through a sewer drain. *Id.* The plaintiffs had purchased supplemental coverage for losses caused by sewer or drain backups, but damage caused by flood or surface water was expressly excluded from coverage by their policy. *Id.* Accordingly, their insurer reimbursed the plaintiffs for some of the damage but, because it concluded that the majority of the damage was caused by surface water, refused to cover the full extent of the plaintiffs' loss.

¶ 49 Relying on *Heller*, the plaintiffs argued that the window wells changed the character of the surface water, since it no longer "flow[ed] naturally" on "the earth's surface." *Id.* at 1267 (quoting *Heller*, 800 P.2d at 1008). The trial court disagreed with the plaintiffs' concept of surface water and the role of the window wells, and it granted the insurer's motion for summary judgment on the issue of coverage. *Id.* at 1266. The Illinois Court of Appeals affirmed, concluding that "surface water means water derived from

natural precipitation that flows over or accumulates on the ground without forming a definite body of water or following a defined watercourse." *Id.* at 1268. Therefore, because "[t]here was no evidence that the water emptied into plaintiffs' basement from a defined waterway or channel," the court concluded that the insurer was entitled to judgment as a matter of law. *Id.*; *see also Park Ridge Presbyterian Church v. Am. States Ins. Co.*, No. 11 C 5231, 2014 WL 4637433, *6-7 (N.D. Ill. Sept. 17, 2014) (concluding that a light well did not change the character of surface water that had entered the well).[6] We are persuaded by the reasoning in *Smith* and apply it in this case. Here, as in *Smith*, the window wells were not a defined channel or watercourse such that the character of the surface water was changed upon entering them.

---

[6] We have not found, and Martinez has not cited, any case where a court has extended *Heller*'s trench analysis to window wells. Although a few courts have held that surface water lost that character, those cases involved facts much more similar to the trenches in *Heller*. *See, e.g., Georgetowne Square v. U.S. Fid. & Guar. Co.*, 523 N.W.2d 380, 380 (Neb. Ct. App. 1994) (holding that, once channeled through a pipe four feet underground, water lost its character as surface water); *see also Front Row Theatre, Inc. v. Am. Mfr.'s Mut. Ins. Cos.*, 18 F.3d 1343, 1347-49 (6th Cir. 1994) (concluding that surface water that backed up through a drain lost that character, but surface water that never even entered the drain, because the blockage prevented it from doing so, did not).

¶ 50 Martinez's reliance on *Chateau Village North Condominium Ass'n v. American Family Mutual Insurance Co.*, 170 F. Supp. 3d 1349 (D. Colo. 2016), is misplaced because that case is distinguishable. In *Chateau*, the plaintiff had an all-risk insurance policy that excluded coverage for flood and surface water. *Id.* at 1352. However, the plaintiff had purchased supplementary coverage for damage caused by sewer and drain backups. *Id.* at 1352-53. After the sewers near the plaintiff's property were inundated by surface water, the sewers overflowed, damaging the plaintiff's property. *Id.* at 1353. In light of the seemingly conflicting terms in the insurance policy, as well as disputed factual issues regarding causation, the court denied the insurance company's motion for summary judgment. *Id.* at 1359.

¶ 51 In this case, Martinez did not purchase supplementary coverage for an express type of peril that contributed to the damage to his home. Moreover, the sewer system in *Chateau*, in terms of its diversion of surface water through a defined channel, is significantly more analogous to the trenches in *Heller* than the window wells in Martinez's home. Further, there is no dispute here

25

about causation or competing provisions within the insurance policy. The anti-concurrent cause provision in Martinez's policy, unlike that in *Chateau,* is definitive.

¶ 52 In sum, we conclude that, under any version of events alleged by Martinez, the precipitation that accumulated within the window wells of his home was surface water, and its character was not changed upon entering the window wells. Because we have concluded that the insurance policy unambiguously barred coverage as a matter of law, we agree with the district court's entry of summary judgment in favor of American Family.

## IV. Conclusion

¶ 53 The judgment is affirmed.

JUDGE DAVIDSON and JUDGE PLANK concur.